**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

Case No. **08-22504-CIV-MOORE/SIMONTON**

```
-------------------------------------------------------------

NATIONAL FOOTBALL LEAGUE PLAYERS                    :
INCORPORATED                                         :
                                                     :
             Plaintiff,                              :
                                                     :
       v.                                            :
                                                     :
CBS INTERACTIVE, INC.                                :
                                                     :
             Defendant.                              :
-------------------------------------------------------------
```

```
+-----------------------------------+
| FILED by   IG      D.C.           |
| ELECTRONIC                        |
|                                   |
|        SEPT 09, 2008              |
|                                   |
|     STEVEN M. LARIMORE            |
|     CLERK U.S. DIST. CT.          |
|     S.D. OF FLA. - MIAMI          |
+-----------------------------------+
```

**COMPLAINT**

Plaintiff National Football League Players Incorporated ("NFL PLAYERS" or "Plaintiff"), by and through undersigned counsel, hereby files its Complaint against Defendant CBS Interactive, Inc. ("CBS Interactive" or "Defendant"), and alleges as follows:

**NATURE OF THE ACTION**

1.     This complaint seeks equitable and monetary relief to remedy the injuries caused to NFL PLAYERS by CBS Interactive's willful conduct relating to the unauthorized and unlicensed use of the names, images, likenesses, photographs, statistics and biographical information of professional football players in the National Football League ("Property Rights") in connection with CBS Interactive's commercial operation of "fantasy football" games ("Fantasy Football Games") through, *inter alia*, its business division and Internet website, www.cbssports.com, in violation of the exclusive NFL player group licensing rights held by Plaintiff. In addition, this action seeks to prevent CBS Interactive from improperly and

Dockets.Justia.com

unlawfully using the Property Rights in connection with its promotion and advertising of the Fantasy Football Games. Such wrongful acts have caused Plaintiff to suffer monetary damages as well as irreparable harm to its Property Rights for which Plaintiff seeks relief.

## THE PARTIES

2.      Plaintiff NFL PLAYERS is a Virginia corporation with its principal place of business at 1133 20th Street N.W., 5th Floor, Washington, D.C. 20036. NFL PLAYERS is a for-profit, partially owned subsidiary of the National Football League Players Association, Inc. ("NFLPA") and, among other things, is engaged in the business of licensing the valuable Property Rights of active National Football League players ("Players").

3.      Defendant CBS Interactive is a Delaware corporation. CBS Interactive operates the website at issue in this case through its CBSSports.com business unit, which is headquartered in Fort Lauderdale, Florida.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over the claims asserted herein pursuant to 28 U.S.C. §§ 1331, 1337, 2201, 2202 as well as 15 U.S.C. § 15 and 15 U.S.C § 26. The Court also has jurisdiction pursuant to 28 U.S.C. § 1332(a)(2), in that the claims asserted herein involve citizens of different states and the controversy exceeds the sum of $75,000, exclusive of interest and costs. The Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 in connection with Plaintiff's state law claims.

5.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b) and (c) because CBS Interactive is subject to personal jurisdiction in this District in that CBS Interactive: (i) regularly transacts business in the Southern District of Florida; (ii) negotiated business with NFL PLAYERS, including the license agreement referenced herein, with its employees situated in the

2

Southern District of Florida; and (iii) operates the www.cbssports.com website at issue through CBSSports.com's business headquarters in Fort Lauderdale, Florida.

## BACKGROUND

### NFL PLAYERS's Exclusive Group Licensing Rights

6.     NFL PLAYERS was incorporated in 1994 to, among other things, maximize and commercially exploit the increasingly valuable name, image, identity, signature, facsimile, voice, picture, photograph, likeness and/or biographical information of Players in group licensing programs. Although the "for-profit" NFL PLAYERS is affiliated with the NFLPA, a "not-for-profit" labor union, NFL PLAYERS is a separate entity from the NFLPA and NFL PLAYERS has a separate staff from the NFLPA to further its distinctive business goals and purposes.

7.     Under paragraph 4(b) of the collectively bargained NFL Player Contract, the vast majority of Players expressly assign all of their valuable and proprietary rights in "group licensing" programs, as follows:

> Player hereby assigns to the NFLPA and its licensing affiliates **[NFL PLAYERS ]**, if any, the **exclusive right** to use and to grant to persons, firms, or corporations (collectively "licensees") the right to use his name, signature facsimile, voice, picture, photograph, likeness and/or biographical information (collectively "image") in group licensing programs. Group licensing programs are defined as those licensing programs in which a licensee utilizes a total of six (6) or more NFL player images on or in conjunction with products (<u>including, but not limited to</u>, trading cards, clothing, videogames, computer games, collectibles, <u>Internet sites, fantasy games</u>, etc.) that are sold at retail or used as promotional or premium items. . . The terms of this subparagraph apply unless, at the time of execution of this contract, Player indicates by striking out this subparagraph (b) and marking his initials adjacent to the stricken language his intention not to participate in the NFLPA Group Licensing Program. . . . (Emphasis added.)

8.     The NFLPA's sole licensing affiliate for the purpose outlined in paragraph 4(b) of the NFL Player Contract is NFL PLAYERS. Player group licensing rights are assigned to NFL

3

PLAYERS and are subject to its control, administration and enforcement. NFL PLAYERS has the right to enter into agreements licensing group player rights, on-line and otherwise, for products, services and sponsors, and to take legal action to enforce Player Property Rights.

9. In addition to the NFL Player Contract, Players also execute separate Group Licensing Assignments ("GLAs"), pursuant to which such Player's group licensing rights are later assigned by the NFLPA to NFL PLAYERS on terms similar to those set forth in paragraph 4(b) of the NFL Player Contract.

10. The GLA explicitly defines "group licensing programs" as follows:

> Group licensing programs are defined as those licensing programs in which a licensee utilizes a total of six (6) or more NFL player images in conjunction with or on products that are sold at retail or used as promotional or premium items.

### NFL PLAYERS's Property Rights Encompass Fantasy Football Games and Internet Uses

11. Currently, NFL PLAYERS grants licenses to scores of companies in the United States and throughout the world to use various aspects of its group licensing rights in connection with products, including fantasy football and other interactive games, websites, trading cards, video games, memorabilia, and apparel.

12. NFL PLAYERS currently licenses player names and identifying characteristics to multiple proprietors of fantasy football games advertised and conducted in print and online formats. NFL PLAYERS earns royalties and fees by licensing these games, and the resulting revenues are shared with active Players whose group licensing rights are assigned to NFL PLAYERS.

13. In addition to the most recent license agreement entered into between NFL PLAYERS and CBS Interactive, as described in paragraphs 16 through 20 hereunder, NFL

PLAYERS has an extensive history of licensing arrangements in connection with fantasy football games, including without limitation, the following:

- a July 27, 1994 license agreement with CDM Fantasy Sports;
- a June 30, 1995 license agreement with Sportsline, USA, Inc., the entity subsequently acquired by Defendant CBS Interactive;
- a July 28, 1997 license agreement with Sandbox Entertainment;
- an August 5, 1997 license agreement with Small World Sports;
- an August 12, 1997 license agreement with All Sports Entertainment, Inc.;
- a July 30, 1999 license agreement with Sportsline, USA, Inc., the entity subsequently acquired by Defendant CBS Interactive;
- an August 6, 1999 license agreement with STATS, Inc.;
- a January 20, 2000 license agreement with Electronic Arts, Inc.;
- a January 26, 2001 license agreement with NFL Properties, Inc.;
- a July 9, 2001 license agreement with SportingNews.com, Inc, a division of Fox Interactive Television LLC;
- an August 31, 2002 license agreement with WhatIfSports.com, Inc.;
- a February 28, 2003 license agreement with ABC, Inc.;
- a June 2006 license agreement with Sportline.com Inc.;
- a July 7, 10, 2007 license agreement with AOL;
- a August 23, 2007 license agreement with Fox Sports;
- a June 6, 2008 license agreement with ESPN;
- a June 16, 2008 license agreement with Electronic Arts;
- a July 31, 2008 license agreement with Yahoo; and
- an Internet license agreement with the NFL.

14.     NFL PLAYERS is the only entity that has the right to license Player group Property Rights for fantasy football games.   The NFLPA has not entered into, and does not enter into, any such licensing agreements in connection with fantasy football games.

15.     NFL PLAYERS's exclusive licensing rights for Player group Property Rights have previously been confirmed by this Court.  See Gridiron.com v. National Football League

Player's Association, Inc. and National Football League Players, Inc., 106 F. Supp. 2d 1309 (S.D. Fla. 2000).

## The CBS Interactive and NFL PLAYERS License Agreement

16.     NFL PLAYERS has entered into license agreements with CBS Interactive in the past to exploit the group Property Rights of Players. In fact, CBS Interactive or its predecessors have been a continuous licensee of NFL PLAYERS since the mid-1990s; the most recent licensing agreement between the parties was effective March 1, 2007 and expired on February 29, 2008 (the "2007 CBS Agreement").

17.     Pursuant to the 2007 CBS Agreement, NFL PLAYERS granted to CBS Interactive the non-exclusive right, license and privilege of using the names, likenesses, pictures, photographs, voices, facsimile signatures and/or biographical information of Players in Fantasy Football Games. See 2007 CBS Agreement, attached hereto as Exhibit A.

18.     Paragraph 2(A) of the 2007 CBS Agreement sets forth the specific rights granted to CBS Interactive:

> [CBS Interactive] shall be able to offer "command and control" access via wireless devices and networks, game consoles and other devices/networks as they become available to its Licensed Products that are primarily accessible and distributed via the Internet, provided, however, that the specific manner in which the rights licensed hereunder are to be used in the creation, distribution and promotion of the Licensed Product(s) in question shall require prior written consent of NFL PLAYERS, not to be unreasonably withheld or delayed. For purpose of clarity, the term "Licensed Products" as used in this Agreement refers only to fantasy football games that utilize the [Property Rights] of NFL players ...

19.     CBS Interactive has acknowledged the application of NFL PLAYERS's right to CBS Interactive's operation of Fantasy Football Games by virtue of having licensed the Property Rights continuously (through itself or its predecessors) since the mid-1990s from NFL PLAYERS, and most recently, by virtue of having entered into the 2007 CBS Agreement.

20. Significantly, CBS Interactive has also acknowledged and agreed that the Property Rights of NFL PLAYERS have special goodwill and secondary meaning, and that such goodwill belongs exclusively to NFL PLAYERS. Paragraph 14(A) of the 2007 CBS Agreement, provides as follows:

> [CBS Interactive] recognizes the great value of goodwill associated with the rights licensed in Paragraph 2 of this Agreement and acknowledges that such goodwill belongs exclusively to [NFL PLAYERS] and that said trademarks, names and rights licenses in Paragraph 2 of this Agreement have acquired secondary meaning in the mind of the public.

21. The 2007 CBS Agreement ended on February 29, 2008. NFL PLAYERS has informed CBS Interactive that it required a new license if CBS Interactive wanted to continue to utilize the Property Rights, but, as described below, CBS Interactive has refused to enter into any such agreement.

## CBS Interactive's Violation of NFL PLAYERS's Property Rights

22. The CBS Interactive website, www.cbssports.com, in connection with its Fantasy Football Games, uses the Property Rights of six or more Players, including Players who have executed both an NFL Player Contract and a GLA. The CBS Interactive website and Fantasy Football Games are using the Property Rights of Players who are under exclusive contract to NFL PLAYERS for use in any group licensing program, which includes the use of " . . . six (6) or more NFL Player images on or in conjunction with products (including but not limited to . . . Internet sites, fantasy games, etc.) . . . ."

23. Excerpts from the CBS Interactive website are attached hereto as Exhibit B.

24. The CBS Interactive website entices users to register with the site (through either a paid or free membership) and compete for cash prizes by managing selected teams through a process of assembling the valuable and particular names of current Players whose actual

7

statistical performance in each game tracks the Players' actual performance in the course of the NFL season. The goodwill and commercial value of the NFL Player names and performances creates the so-called "fantasy" in this commercial football experience and enterprise. Users assemble their teams by participating in a simulated player "draft" and can select player names (to incorporate by selection their statistics) from different NFL teams. The website also depicts the images, pictures and likenesses of the Players. All of these unauthorized acts are done by CBS Interactive in connection with the Fantasy Football Games without any license or permission from NFL PLAYERS to do so. Defendant also uses the images, pictures, likenesses and names of the Players to directly promote, advertise and solicit players for its Fantasy Football Games.

25.     CBS Interactive's web pages display, collectively and in some cases individually, six or more NFL Player Property Rights for the purpose of marketing and promoting participation in Fantasy Football Games, as well as to drive valuable traffic to its website, www.cbssports.com. CBS Interactive generates substantial revenues from this commercial activity.

26.     Each of the web pages that constitute the CBS Interactive website, including the linked pages devoted to individual Players, are aggregated, linked, and connected to form the Fantasy Football Games product; a fantasy football game with both online and offline aspects, which is marketed to consumers worldwide.

27.     After the expiration of the 2007 CBS Agreement, NFL PLAYERS approached CBS Interactive about renewing its license to NFL Player Property Rights. Between the months of February and August 2008, NFL PLAYERS made various attempts to persuade CBS Interactive to enter into a new license agreement, but to no avail. Finally, during a call in August

8

2008, Defendant advised NFL PLAYERS that it would not enter into a new license agreement with NFL PLAYERS because Defendant took the position that is was not required to do so because of the Eighth Circuit's decision in C.B.C. Distrib. & Mktg. v. Major League Baseball Advanced, L.P., 505 F.3d 818 (8th Cir. 2007). NFL PLAYERS responded that it did not believe the Eighth Circuit's decision relating to a fantasy baseball game reflected the law of other Circuits and States, and that CBS Interactive would have to respect the Property Rights of NFL PLAYERS and obey applicable law to use the Property Rights.

28.     Defendant continued to use the Property Rights of six or more Players, including Players who have executed both an NFL Player Contract and a GLA. Defendant's ongoing and repeated use of the Property Rights is a willful violation of the valuable NFL Player rights of publicity assigned to NFL PLAYERS.

29.     Such conduct by CBS Interactive is also in violation of NFL PLAYERS's Property Rights as reflected in paragraphs 15(A) and (B) of the 2007 CBS Agreement:

> (A)     [CBS Interactive] agrees that every use of the rights licensed hereunder by [CBS Interactive] shall inure to the benefit of [NFL PLAYERS] and that [CBS Interactive] shall not at any time acquire any title or interest in such rights by virtue of any use [CBS Interactive] may make of such rights hereunder.

> (B)     All rights relating to the rights licensed hereunder are specifically reserved by [NFL PLAYERS] except for the license herein granted to [CBS Interactive] to use the rights as specifically and expressly provided in this Agreement.

30.     NFL PLAYERS has objected to CBS Interactive's unauthorized use and provided notice that such use is improper and unacceptable.

### CBS Interactive's Improper Attempt to Forum Shop For an Advisory Opinion

31.     On or about September 3, 2008, CBS Interactive filed an action against the NFLPA, an improper party, in Minnesota District Court (the "Minnesota Action"), an improper

and inconvenient forum for this matter. See Exhibit C, CBS Interactive Inc. v. National Football League Players Association. Neither NFL PLAYERS nor CBS Interactive has an office or any significant contacts with the State of Minnesota. Indeed, Minnesota Courts do not have personal jurisdiction as to this matter over NFL PLAYERS, the only entity with which CBS Interactive entered any license agreement for the Property Rights, negotiated terms, or has a dispute concerning this matter. CBS Interactive's complaint in the Minnesota Action acknowledges that it has "formerly entered into multiple licensing agreements with the Players Association through its licensing entity [NFL PLAYERS]." All of the individuals who participated in discussions with Defendant about a possible new license were either employees of NFL PLAYERS or counsel for NFL PLAYERS. No person conducted licensing discussions with Defendant on behalf of the NFLPA. The law of the Eighth Circuit is not applicable to this dispute. Likewise, the forum of Minnesota is improper for this dispute.

32.     Defendant chose not to file an action against NFL PLAYERS or file suit in a State where NFL PLAYERS is domiciled, maintains an office, or has sufficient contacts. It is obvious that CBS Interactive filed the Minnesota Action against an improper party, the NFLPA, in order to seek an advisory opinion from a favorable forum, even though that forum has no jurisdiction over the dispute.

33.     The NFLPA is a separate entity from NFL PLAYERS. It has never entered into a contractual relationship with CBS Interactive regarding the Property Rights. Indeed, the NFLPA assigned its Players Property Rights for Fantasy Football Games to NFL PLAYERS. CBS Interactive has had no dealings whatsoever with the NFLPA regarding the Property Rights.

34.     Accordingly, the Minnesota Action is improper and should be transferred and/or dismissed.

**Damages to NFL PLAYERS**

35. By using the Property Rights of NFL PLAYERS in the Fantasy Football Game on the CBS Interactive website without authorization, Defendant is causing and threatens to cause economic damage to the Plaintiff by diverting business from authorized licensees of NFL PLAYERS, depriving NFL PLAYERS of licensing fees to which it is entitled for the use of its exclusive group licensing rights, and by creating potential and actual conflicts with already existing licensees for Fantasy Football Games. In addition, by engaging in the unauthorized use of Players' attributes in Fantasy Football Games on the CBS Interactive website, Defendant is usurping the goodwill associated with, and the commercial value of, NFL PLAYERS's exclusive group licensing rights – goodwill and value which NFL PLAYERS and the Players have carefully developed, nurtured and guarded through the investment of significant time, energy and money over many years.

**COUNT I**
**(Fla. Stat. § 540.08 Unauthorized Publication of Name or Likeness)**

36. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 35 as if fully set forth herein.

37. Plaintiff is the exclusive assignee of Players' publicity rights to use or license Property Rights in Fantasy Football Games which utilize six or more NFL Player Property Rights.

38. The use by Defendant of the NFL Player Property Rights on the Defendant's website, and in its Fantasy Football Games, constitutes a use for commercial purposes. Such use directly promotes the Fantasy Football Games, and drives valuable traffic from Internet users worldwide to the website of www.cbssports.com, resulting in pecuniary benefits to Defendant. Defendant expressly rejected the offer to obtain consent of the Plaintiff, as the exclusive assignee

11

of Players' rights to use or license their Property Rights in Fantasy Football Games in groups of six or more, as required by Fla. Stat. § 540.08(1).

39.     Defendant's use on the CBS Interactive website, and in the Fantasy Football Games, of the Property Rights of Players for whom the Plaintiff holds exclusive group licensing rights, within the State of Florida, throughout the United States, and worldwide, without the Plaintiff's consent, constitutes a violation of Fla. Stat. § 540.08(1).

40.     By the unauthorized use of Plaintiff's Property Rights in its business and services, Defendant violated the rights of publicity of Players assigned to Plaintiff.

41.     Plaintiff has been injured by virtue of Defendant's willful and malicious use of the Property Rights in violation of Plaintiff's exclusive rights under Fla. Stat. § 540.08(1) and is entitled to recover compensatory damages for such injury, including but not limited to, an amount that would have been a reasonable royalty, under Fla. Stat. § 540.08(2).

42.     Plaintiff is also entitled to equitable relief under Fla. Stat. § 540.08(2) in the form of a permanent injunction prohibiting Defendant from using the Property Rights of Players in connection with Defendant's operation of Fantasy Football Games on its Internet website www.cbssports.com, and from taking any other actions in violation of Plaintiff's Property Rights.

43.     Plaintiff is entitled to recover all profits of the Defendant attributable to its violation of the NFL Player publicity rights assigned to Plaintiff, along with exemplary damages, under Fla. Stat. § 540.08(2).

## COUNT II
### (Misappropriation)

44.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 35 as if fully set forth herein.

12

45.     As set forth above, Plaintiff is the exclusive assignee of Players' rights to use or license their Property Rights in Fantasy Football Games which utilize six or more NFL Player Property Rights.

46.     The use by Defendant of the Property Rights of Players, for whom Plaintiff holds exclusive group licensing rights, on the CBS Interactive website, and in its Fantasy Football Games, constitutes an unauthorized misappropriation for commercial purposes. Such use directly promotes the Fantasy Football Games and drives valuable traffic from Internet users worldwide to the website of www.cbssports.com resulting in a pecuniary benefit to Defendant. Defendant expressly rejected the offer to obtain the consent of the Plaintiff, as the exclusive assignee of the Players' rights to use or license their Property Rights in Fantasy Football Games, as required by Florida common law.

47.     Defendant's use on the CBS Interactive website, and in its Fantasy Football Games, of the Property Rights of Players for whom the Plaintiff holds exclusive group licensing rights, within the state of Florida, throughout the United States, and worldwide, without the Plaintiff's consent, constitutes a misappropriation in violation of Florida common law.

48.     By the unauthorized use of Plaintiff's Property Rights in its business and services, Defendant misappropriated the Players' rights of publicity assigned to Plaintiff.

49.     As a result of the Defendant's conduct, Plaintiff has suffered substantial damages in an amount to be determined at trial.

## COUNT III
### (Unjust Enrichment)

50.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 35 as if fully set forth herein.

51.     Defendant's aforementioned unauthorized and unlicensed use of the Property Rights exploits the goodwill that Plaintiff and the Players have developed through many years of hard work and confers an unjust benefit on Defendant.

52.     Defendant is fully aware of the benefit that it is receiving by using the Property Rights, and Defendant voluntarily accepts and retains the unjust benefit conferred.

53.     It is inequitable for Defendant to retain the benefit without paying the value thereof to Plaintiff.

54.     Defendant has thus been unjustly enriched by its unlawful acts to the detriment of Plaintiff.

55.     Defendant should be required to disgorge any profits it has earned as a result of its unjust enrichment.

## COUNT IV
### (Injunction)

56.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 35 as if fully set forth herein.

57.     Plaintiff will suffer irreparable injury unless an injunction is issued barring Defendant from using Plaintiff's Property Rights without permission, including on the CBS Interactive website, and in its Fantasy Football Games, or taking any other actions inconsistent with or in violation of Plaintiff's Property Rights.

58.     Plaintiff has no adequate remedy at law.

59.     Defendant will suffer no cognizable damage if such an injunction is issued because Defendant has no right to violate the Plaintiff's Property Rights.

60.     The issuance of the requested injunction would not be adverse to the public interest.

61.     Unless Defendant is enjoined from continuing and, in the future, repeating the aforesaid unlawful acts, Plaintiff will continue to suffer irreparable harm.

### COUNT V
### (Antitrust Declaratory Judgment)

62.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 35 as if fully set forth herein.

63.     Plaintiff brings this action for declaratory judgment, pursuant to 28 U.S.C. §§ 2201, 2202 as an actual controversy within this Court's jurisdiction exists between the Plaintiff and the Defendant.

64.     In its Minnesota Action, CBS Interactive alleges that the purported actions of the NFLPA demanding a license from CBS Interactive and other persons constitute a violation of the federal antitrust laws, specifically, monopolization and attempted monopolization in violation of Section 2 of the Sherman Act, based on the purported "clarity of the law on this issue" following the Eighth Circuit decision in C.B.C. Distribution and Marketing, Inc. v. Major League Baseball, 505 F.3d 818 (8th Cir. 2007) ("C.B.C.") and the subsequent denial of certiorari in that case by the U.S. Supreme Court, 128 S. Ct. 2872 (2008).

65.     Apart from the fact that CBS Interactive named the wrong party in the Minnesota Action to try to obtain a forum advantage, the actions of NFL PLAYERS demanding that CBS Interactive and other persons cease using the Property Rights of NFL PLAYERS without authorization does not constitute a violation of Section 2 of the Sherman Act.

66.     NFL PLAYERS had, and has, an objectively reasonable basis for asserting its Property Rights against CBS Interactive as to its use of the Property Rights and other attributes

15

of NFL PLAYERS without authorization. In fact, such use is a violation of law by CBS Interactive.

67.     NFL PLAYERS was not a party to the C.B.C. action. The Eighth Circuit ruling in C.B.C. was a unique and erroneous ruling, the C.B.C. ruling is not binding in any way in any jurisdiction outside the Eighth Circuit, the filing by NFL PLAYERS of an amicus curiae brief did not make NFL PLAYERS a party to that action, the denial of certiorari by the U.S. Supreme has no precedential effect whatsoever, and the Eighth Circuit decision in C.B.C. was wrongly decided, is contrary to law, and is not applicable to the dispute between Plaintiff and Defendant.

68.     The actions of NFL PLAYERS demanding that CBS Interactive and other persons cease using the Property Rights and other attributes of NFL PLAYERS without authorization do not constitute an attempt to monopolize or actual monopolization of any relevant market in violation of Sherman Act § 2.

        **WHEREFORE**, Plaintiff prays for the following relief:

        1.     A declaration that Defendant's use of the Property Rights in connection with its operation of Fantasy Football Games on its Internet website www.cbssports.com without Plaintiff's consent is a violation of the statutory and common law publicity rights exclusively assigned to the Plaintiff.

        2.     An award of compensatory and exemplary damages to the Plaintiff in an amount to be determined at trial;

        3.     A permanent injunction prohibiting Defendant from using the Property Rights on the CBS Interactive website, and in or in connection with its Fantasy Football Games, or from taking any other actions that are inconsistent with, or in violation of, Plaintiff's exclusive group licensing rights;

4. A declaration that the actions of NFL PLAYERS demanding that CBS Interactive and other persons cease using the Property Rights and other attributes of NFL PLAYERS without authorization does not constitute a violation of Section 2 of the Sherman Act;

5. An award in the nature of reimbursement, restitution and disgorgement of all profits of Defendant attributable to its unjust enrichment through its unauthorized use of Plaintiff's Property Rights; and

6. Such additional and further relief, at law and in equity, as the Court deems to be just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated: September 9, 2008

Respectfully submitted,

Christopher E. Knight
Fla. Bar No. 607363
Email: cknight@fowler-white.com
FOWLER WHITE BURNETT P.A.
Espirito Santo Plaza, 14th Floor
1395 Brickell Avenue
Miami, Florida 33131-3302
Telephone: (305) 789-9200
Facsimile: (305) 789-9201

        - and -

Jeffrey L. Kessler (*pro hac vice*)
David Feher (*pro hac vice*)
L. Londell McMillan (*pro hac vice*)
DEWEY & LEBOEUF, LLP
1301 Avenue of the Americas
New York, New York 10019
Telephone: (212) 259-8000
***Attorneys for National Football League Players Incorporated***

# EXHIBIT A

## CONTENT LICENSE AGREEMENT

This Agreement is made and entered into this 1st day of March, 2007 (the "**Effective Date**") by and between CBS Interactive Inc. a Delaware corporation with offices at 2200 W. Cypress Creek Rd., Ft. Lauderdale, FL 33309 (hereinafter "**Licensee**"), and NATIONAL FOOTBALL LEAGUE PLAYERS INCORPORATED, a corporation with offices at 1133 20th Street, N.W., Washington, D.C. 20036 (hereinafter "**PLAYERS INC**" or "**Licensor**").

1.    REPRESENTATIONS.

(A)    PLAYERS INC represents that it is a licensing affiliate of the National Football League Players Association ("**NFLPA**"); that the NFLPA has been duly appointed and is acting on behalf of the football players of the National Football League who have entered into a Group Licensing Assignment, either in the form attached hereto as **Attachment "A"** or through the assignment contained in Paragraph 4(b) of the NFL Player Contract, which have been assigned to PLAYERS INC; and that in such capacity PLAYERS INC has the right to negotiate this contract and the right to grant rights and licenses described herein for the Term (as defined below). Licensee acknowledges that PLAYERS INC also on occasion secures authorization for inclusion in PLAYERS INC licensing programs from players, including but not limited to retired players, who have not entered into such Group Licensing Assignment, but who, nevertheless, authorize PLAYERS INC to represent such players for designated PLAYERS INC licensed programs.

(B)    PLAYERS INC makes no representation that it has the authority to grant, nor does it grant herein, the right to utilize any symbols, insignias, logos, or other identifying names or marks of the National Football League (hereinafter "**NFL**") and/or any of its member clubs. Accordingly, it is understood by the parties hereto that if likenesses of players are to be used by Licensee in conjunction with any symbols, insignia, or logos of the NFL or any of its member clubs, in the exercise of the License granted hereunder, it will be the responsibility of Licensee to obtain such permission as may be necessary for the use of such material from the NFL or the club(s) in question. Licensor retains all rights not expressly and exclusively granted to Licensee hereunder.

2.    GRANT OF LICENSE.

(A)    Upon the terms and conditions hereinafter set forth and during the Term, PLAYERS INC hereby grants to Licensee and Licensee hereby accepts the non-exclusive right and license (the "**License**") of utilizing the trademarks and names of PLAYERS INC (the "**Marks**") which may be amended from time to time by PLAYERS INC and the names, likenesses (including, without limitation, numbers), pictures, photographs, voices, facsimile signatures and/or biographical information (hereinafter "**Identity**") of the NFL players referenced in Paragraph 1(A) above, for commercial purposes in connection with product(s) in the form of fantasy football games distributed over the Internet (hereinafter referred to as the "**Licensed Product(s)**"). Licensee shall be able to offer "command and control" access via wireless devices and networks, game consoles and other devices/networks as they become available to its Licensed Products that are primarily accessible and distributed via the Internet, provided, however, that the specific manner in which the rights licensed hereunder are to be used in the creation, distribution and promotion of the Licensed Product(s) in question shall require the prior written consent of PLAYERS INC, not to be unreasonably withheld or delayed. For purposes of clarity, the term "Licensed Products" as used in this Agreement refers only to fantasy football games that utilize the Identity of NFL players and/or the Marks and shall not include games that do not utilize such Identity, or Marks.

(B)    The License granted by PLAYERS INC hereunder shall not constitute or be used by Licensee as a testimonial or an endorsement of any product, service, or event by all or any of the players, or by PLAYERS INC. In the event Licensee is interested in securing an individual player's personal endorsement for the Licensed Product(s), Licensee further agrees and acknowledges that such endorsement will require the personal approval of the individual player and approval of PLAYERS INC and may require a separate payment to PLAYERS INC. All contact with such player or player's agent shall be made by PLAYERS INC.

EXECUTION

Licensee further agrees and acknowledges that any player who is committed individually by contract for products or services competitive with those of Licensee may be required to cease from further inclusion in this Agreement, provided, however, that the use of such player for such products and services shall be on an individual basis and shall not be combined with the use of five or more other NFL players.

(C)     Notwithstanding the License granted in Paragraph 2(A), it is understood that the players' Identity as defined herein may encompass certain factual data associated with the players at issue and that notwithstanding any other provision of this agreement, following expiration or termination of this Agreement for any reason, the right of the parties hereto with respect to the use of such factual data shall be the same as they were prior to entering into this Agreement or any other agreement.

(D)     Licensee agrees that it will not during the Term challenge the rights of PLAYERS INC in and to the Marks or Identity owned by or licensed to PLAYERS INC or any of the rights licensed hereunder as specified in Paragraph 2 of this Agreement, or in any way challenge the validity of this Agreement.

3.     PREMIUM/GIVEAWAY RESTRICTION.     The Grant of License set forth in Paragraph 2 of this Agreement applies only to the creation, marketing, promotion and distribution of the Licensed Product(s) and the sale of such advertising and promotional rights directly on Licensee's fantasy football property discussed in Paragraph 2 hereof as an element of Licensed Product(s), and except as described above in this sentence shall not permit the use of Licensed Products as a "premium item" or "give-away" to be included with products, services or events; provided, however that Licensee shall be permitted to promote the sale of Licensed Product(s), subject to prior written approval by PLAYERS INC and in a manner consistent with the provisions of this Agreement. Any such promotion using the Licensed Product(s) herein as premium items shall require a separate agreement between PLAYERS INC and Licensee or other sponsor of the promotion, with separate terms and conditions, and nothing contained herein shall obligate either PLAYERS INC or Licensee to enter into such an agreement. This paragraph is not intended to prohibit Licensee from offering the Licensed Product(s) unconditionally to all consumers for free (i.e., no subscription fee).

4.     TERRITORY. Licensee shall have the right to utilize the rights granted hereunder for distribution of the Licensed Product(s) in the following territory: Worldwide.

5.     TERM.

(A)     The term of this Agreement shall commence on March 1, 2007 and run through February 29, 2008 (the "Term"), unless terminated in accordance with the provisions hereof.

(B)     Licensee acknowledges and agrees that Licensee has and shall have no right to extend or renew this Agreement beyond the Term and renewal options, if any, stated herein. No conduct by either Licensor or Licensee (including without limitation, any approvals granted pursuant to Paragraph 12 hereof) shall create, imply or infer a new license agreement or an extension of the stated term and renewal options, if any, of this Agreement, unless same is specifically set forth in a written agreement signed by both Licensor and Licensee. Licensee's agreement that this Agreement is subject to the term and renewal options, if any, stated herein, in all events whatsoever, is a material inducement for Licensor to enter into this Agreement. Upon the natural expiration of this Agreement and provided both parties have met their respective obligations contained herein, the parties agree that they will negotiate in good faith in an effort to come to terms on a new license agreement.

6.     ROYALTY PAYMENT.

(A)     Licensee agrees to pay PLAYERS INC a guaranteed royalty of seven hundred thousand dollars ($700,000) for its use of the rights licensed hereunder for the Term. The guaranteed royalty shall be paid as follows: Three hundred fifty thousand dollars ($350,000) upon the execution of this Agreement, and Three hundred fifty thousand dollars ($350,000) on or before December 1, 2007.

EXECUTION                                                    2

(B)     Such guaranteed royalty payments shall be made by Licensee as specified herein above whether or not Licensee uses the rights licensed hereunder and no part of such guaranteed payments shall be repayable to Licensee.  Notwithstanding the foregoing, if a Force Majeure Event occurs and results in suspension, disruption or impairment of the Licensed Product that causes Licensee, in its sole discretion, to refund subscription fees paid by consumers for the Licensed Products, and, as a result, the Net Revenue royalty payment set forth in 6(C) below is less than the guaranteed royalty payments that have been paid by Licensee for the Term, then Players Inc will refund to Licensee, the difference between such guaranteed royalty payments and the Net Revenue royalty payment.     A "Force Majeure Event" means a circumstance beyond the reasonable control of either Party which suspends, delays, impairs or limits the licenses and rights provided to Licensee in this Agreement, including but not limited to war, strike, terrorist attack, revolution, invasion, insurrection, riots, or acts of God.

(C)     Licensee shall also pay to PLAYERS INC a royalty amount equal to **Eight and one Half Percent (8.5%)** (the "**Royalty Rate**") of Net Revenue (as defined below) attributable to use by Licensee of the rights licensed hereunder, less the guaranteed payments specified Paragraph 6(A) above.  For purposes hereof, "**Net Revenue**" shall mean gross subscription revenue from Licensed Product(s) less any refunds, cancellations, charge backs, credit card processing fees (i.e., merchant fees), cash prizes, and any applicable taxes (excluding income taxes) payable by Licensee.  Royalties shall be calculated on a quarterly basis and shall be due as of the last day of each May, August, November, and February of this Agreement and must be paid no later than thirty (30) days following such due dates.

(D)     In addition, if Licensee offers any Licensed Products for which a subscription fee is not charged (a "**Free Product**"), then, during the Term, Licensee shall pay to Players Inc, a royalty in the amount of Eleven Cents ($.11) per individual registered user for the first five hundred thousand (500,000) users that register for a Free Product but have not registered and paid for another Licensed Product, a royalty of Nine Cents ($.09) per individual registered user for the next five hundred thousand (500,000) users, and a royalty in the amount of Seven Cents ($.07) per individual registered user thereafter (the "**Free Product Royalty**").  For purposes of the foregoing calculation, an individual registered user that has registered for a Licensed Product for which a subscription fee has been paid to Licensee shall not be counted in such calculation and each other individual registered user shall only be counted once regardless of how many Free Products for which such individual registered user shall register during the Term.

7.     PERIODIC STATEMENTS.

(A)     Licensee shall furnish to PLAYERS INC, in a form provided by PLAYERS INC, no later than thirty (30) days following the last day of each May, August, November, and February of this Agreement, a complete and accurate statement certified to be accurate by an authorized representative of Licensee, showing the quantity, description and gross purchase price, of the Licensed Product(s) distributed by Licensee during the preceding quarterly reporting period described in Paragraph 6(C) herein.  By the expiration of the Term, Licensee shall furnish PLAYERS INC with a detailed statement certified by an officer of Licensee, showing the number of gross sales of the Licensed Product(s) covered by this Agreement.

(B)     Such statements shall be furnished to PLAYERS INC whether or not any of the Licensed Product(s) have been purchased during the reporting period for which such statement is due.  The receipt or acceptance by PLAYERS INC of any statement or of any royalty paid hereunder (or the cashing of any royalty check paid hereunder) shall not preclude PLAYERS INC from questioning the correctness thereof at any time, and in the event any inconsistencies or mistakes are discovered in connection therewith, they shall immediately be rectified and the appropriate payment made by the appropriate party.

8.     BOOKS AND RECORDS.

(A)     For a period of two (2) years following the termination or expiration of this Agreement, Licensee shall maintain accurate books and records for itself and any subsidiary or affiliated entity with respect to its sale of Licensed Product(s) under this Agreement.  Said books and records shall be subject to inspection and

audit by PLAYERS INC or its duly authorized representative at reasonable times upon reasonable notice from PLAYERS INC to Licensee. In addition and similarly, Licensee shall use commercially reasonable efforts to cause any entity from which it contracts for services or production of product to cause its books and records to be available for audit and inspection by PLAYERS INC to the extent necessary to confirm the audit of Licensee. Licensee shall not interfere with such inspections and audits in any way.

(B)     The cost of such inspections and audits shall be paid by Licensee if the result of such inspections and audits indicates a difference of 2% or more, when compared to the statement certified to be accurate by an officer of Licensee, as required by Paragraph 7 (A) of this Agreement, or the cost of such inspections and audits as the result of an inspection or audit performed by PLAYERS INC as specified in Paragraph 8(A) above shall be paid by PLAYERS INC if such difference is less than 2%.

(C)     In the event of any inconsistencies or mistakes are discovered as a result of such inspections and audits, they shall immediately be rectified and the appropriate payment made by the appropriate party.

9.     PAYMENT, INTEREST AND NOTICES.     All transactions under this Agreement, including without limitation all payments, and all notices, reports, statements, approvals and other communications, shall be with or made payable in the name of NATIONAL FOOTBALL LEAGUE PLAYERS INCORPORATED, 1133 20th Street, N.W., Washington, D.C. 20036, or its assignee where applicable. With regard to all guaranteed royalty and actual royalty payments only, such payments shall be made by wire transfer in accordance with **Attachment "B"** attached hereto. In addition to all other rights contained in this Agreement, PLAYERS INC shall be entitled to collect and Licensee shall pay daily interest at the rate of one and one-half percent (1 1/2%) monthly, or the maximum interest permitted by law if less, on all payments not timely made by Licensee.     All correspondence, notices, approvals and other communications to Licensee shall be with CBS Interactive Inc., 2200 W. Cypress Creek Rd., Ft. Lauderdale, FL 33309.

10.     INDEMNIFICATION; DISCLAIMER OF WARRANTIES AND LIMITATION OF LIABILITY.

(A)     Licensee for its own acts hereby indemnifies PLAYERS INC and undertakes to defend PLAYERS INC from and against any and all claims, suits, losses, damages, and expenses (including reasonable attorney's fees and expenses) arising out of the manufacture, marketing, sale, distribution, or use of the Licensed Product(s) which are the subject of this Agreement. Licensee agrees to obtain, at its own expense, general liability insurance, providing adequate protection for Licensee and PLAYERS INC against any such claims or suits in amounts not less than Three Million Dollars ($3,000,000.00). Within thirty (30) days from the date hereof, Licensee shall submit to PLAYERS INC a fully paid policy or certificate of insurance naming PLAYERS INC as an insured party, requiring that insurer will not terminate or materially modify such without written notice to PLAYERS INC at least twenty (20) days in advance thereof.

(B)     PLAYERS INC hereby indemnifies Licensee and undertakes to defend Licensee against, and hold Licensee harmless from any liabilities, losses, damages, and expenses (including reasonable attorney's fees and expenses) resulting from claims made or suits brought against Licensee based upon the use by Licensee of the rights licensed in Paragraph 2 strictly as authorized in this Agreement.

(C)     EXCEPT AS SPECIFIED IN THIS AGREEMENT, NEITHER PARTY MAKES ANY WARRANTY IN CONNECTION WITH THE SUBJECT MATTER OF THIS AGREEMENT AND HEREBY DISCLAIMS ANY AND ALL IMPLIED WARRANTIES, INCLUDING, WITHOUT LIMITATION, ALL IMPLIED WARRANTIES OF MERCHANTABILITY AND/OR FITNESS FOR USE AND/OR A PARTICULAR PURPOSE REGARDING SUCH SUBJECT MATTER.

(D)     EXCEPT WITH RESPECT TO A PARTY'S DUTIES OF INDEMNIFICATION AS SET FORTH IN THIS SECTION 9, IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER FOR ANY SPECIAL, INDIRECT, PUNITIVE, INCIDENTAL OR CONSEQUENTIAL DAMAGES, OF ANY NATURE WHATSOEVER (WHETHER BASED ON BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY OR OTHERWISE), INCLUDING WITHOUT LIMITATION ANY LOST REVENUES OR

PROFITS OF CBSI, WHETHER OR NOT SUCH DAMAGES ARE FORESEEABLE OR THAT PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGE.

(E)     This Paragraph 9 shall survive the expiration and/or termination of this Agreement.

11.    COPYRIGHT AND TRADEMARK NOTICES.

(A)     Wherever practicable, Licensee shall prominently place or cause to be placed the Marks on the Licensed Products and on any advertising (both print and media regardless of medium, e.g., broadcast, Internet, etc.), and any other promotional material, including trade show booths and exhibits, sales catalogues, and other sales/marketing materials in connection with such Licensed Product(s) that are publicly distributed or relating to such Licensed Product(s).

(B)     The Marks appearing on the Licensed Product(s) and on all materials in connection with the Licensed Product(s) distributed or relating to such Licensed Product(s), shall appear precisely according to the specifications set forth in Appendix A attached hereto, which may be amended from time to time by Licensor, without variation, with the letter "R" enclosed within a circle. Further, Licensee shall provide to Licensor the date of the first use of such Licensed Product(s) bearing the Marks in intrastate and interstate commerce.

(C)     Additionally, Licensee shall imprint or cause to be imprinted the following text on any such Licensed Product(s) and/or materials therefore:

"Officially Licensed Product of
PLAYERS INC"

The specific text imprinted shall be subject to Licensor's sole discretion.

12.    APPROVALS.

(A)     The list of players for whom PLAYERS INC has group licensing authorization (the "**Player Agreement Report**") is available to Licensee via the Internet at www.nflplayers.com/licensee with Licensee's "user name" and "password" as provided to Licensee by Licensor. In addition, PLAYERS INC may secure authorization from players not listed on the Player Agreement Report, including but not limited to retired players. Notwithstanding the foregoing:

(i)     Annually by June 30, 2007, Licensee shall submit to PLAYERS INC a proposed list of players' names for inclusion in the Licensed Product(s) for the upcoming football season. Licensee shall cross-reference its player list against the current Player Agreement Report. After cross-referencing the lists, Licensee must submit its proposed final player list to PLAYERS INC for approval.

(ii)     PLAYERS INC shall respond to such submissions in writing to Licensee, signifying approval or disapproval in the case of each player's name so requested.

(iii)     Licensee may submit requests in writing to PLAYERS INC for additions, deletions, or substitutions of players' names and PLAYERS INC shall respond to such requests within a reasonable period of time.

(B)     The Licensee agrees to furnish PLAYERS INC free of cost for its written approval as to quality and style, not to be unreasonably withheld or delayed, a mock up of representative web pages of each Licensed Product(s) prior to the commercial launch of such Licensed Product(s). No Licensed Product(s) shall be sold or distributed by the Licensee without such prior written approval, not to be unreasonably withheld or delayed. No later than two weeks prior to the first NFL regular season game of the applicable

License Period, Licensee will provide PLAYERS INC with five (5) user names and passwords for PLAYERS INC's internal use including, but not limited to, monitoring the public version of the Licensed Product(s) to ensure Licensee's compliance with its obligations herein.

(C)     Notwithstanding anything herein to the contrary, Licensor acknowledges and agrees that Licensee may choose to use the Identity(ies), including, without limitation, player names and/or likenesses to promote Licensed Product(s) on or in radio or television commercials, any material pertaining to packaging, hangtags, wrapping material, print ads, flyers, point-of-purchase displays, press releases, catalogues, trade show booths and exhibits, sales catalogues and other sales/marketing materials, or any other written material or medium, including but not limited to electronic or interactive use; provided, however, that such use shall require the prior written approval of PLAYERS INC and may require additional payment to PLAYERS INC separate from and in addition to any guarantees or royalty payments contained in this Agreement.  The amount of such payment, if any at PLAYERS INC's sole discretion, shall be subject to mutual agreement by PLAYERS INC and Licensee.  All contacts with such players or their agents shall be made by PLAYERS INC. Licensee agrees to furnish PLAYERS INC all scripts and story boards for proposed commercials for any medium in connection with the promotion of the Licensed Product(s), and the content of such scripts and story boards shall require the prior written approval of PLAYERS INC, not to be unreasonably withheld or delayed, before any commercials shall be made or shall be contracted for by Licensee.

(D)     In the event Licensee wishes to secure an individual player or players to make appearances to promote Licensed Product(s) or to autograph material related to Licensed Product(s), the selection of such player and the separate fee to PLAYERS INC for such player services shall be subject to mutual agreement between Licensee and PLAYERS INC.  All contact with requested player or his agents shall be made by PLAYERS INC.  Once the player has made the appearance or performed the autograph service, payment shall be made immediately to PLAYERS INC.  Any such payments shall be separate from and in addition to any royalties paid by Licensee under this Agreement.  Once the selection of such player and such separate fee have been agreed upon by Licensee and PLAYERS INC, in the event of cancellation of such appearance or autographing (other than by player or PLAYERS INC), Licensee shall nevertheless be obligated to make such fee payment to PLAYERS INC immediately upon such cancellation.

(E)     Licensee agrees to furnish PLAYERS INC all proposed press materials, for any and all mediums, in connection with the promotion of the Licensed Product(s) and further agrees not to distribute or otherwise make available such materials unless and until Licensee receives the prior written approval of PLAYERS INC, not to be unreasonably withheld or delayed.

13.     NON-INTERFERENCE.  Licensee agrees and acknowledges that it shall not secure or seek to secure, directly from any player, who is under contract to an NFL club, is seeking to become under contract to an NFL club, or at any time in the past was under contract to an NFL club, or from such player's agent, permission or authorization for the use of such player's name, facsimile signature, image, likeness, photograph or biography in conjunction with the Licensed Product(s) herein.

14.     GOODWILL.

(A)     Licensee recognizes the great value of the goodwill associated with the rights licensed in Paragraph 2 of this Agreement and acknowledges that such goodwill belongs exclusively to PLAYERS INC and that said trademarks, names and rights licensed in Paragraph 2 of this Agreement have acquired secondary meaning in the mind of the public.

(B)     Licensee agrees that all elements (including all material of any nature utilizing in any way the rights licensed hereunder, including but not by way of limitation, all packages, cartons, point of sale material, newspaper and magazine advertisements) of the Licensed Product(s) shall be of high standard and of such style, appearance and quality as to be adequate and suited to the best advantage and to the protection and enhancements of such rights; that the marketing of the Licensed Product(s) will be conducted in accordance with all applicable federal, state and local laws and any other governmental or quasi-governmental laws or

regulations of the United States; and that the Licensed Product(s) and their exploitation shall be of high standard and to the best advantage and that the same in no manner reflect adversely upon the good name of PLAYERS INC.

## 15.    SPECIFIC UNDERTAKINGS OF LICENSEE.

(A)    Licensee agrees that every use of the rights licensed hereunder by Licensee shall inure to the benefit of PLAYERS INC and that Licensee shall not at any time acquire any title or interest in such rights by virtue of any use Licensee may make of such rights hereunder.

(B)    All rights relating to the rights licensed hereunder are specifically reserved by PLAYERS INC except for the License herein granted to Licensee to use the rights as specifically and expressly provided in this Agreement.

(C)    On a quarterly basis Licensee shall provide to PLAYERS INC a count by month of the number of users of the licensed product.

(D)    Licensee agrees to spend the following total amounts on activities which stimulate and promote the market for Licensed Product(s) through player appearances, highlighting, autographing, or endorsements, and/or PLAYERS INC branded programs, properties, or events (hereinafter "marketing payments"), subject to prior written approval by PLAYERS INC of such activities:

$100,000, during the Term.

Such activities shall not include standard and customary industry trade advertising and sales materials.

If, at the end of each annual period or license periods covered by this Agreement, Licensee has not spent the required amount for such period specified above in this Paragraph 15(E), then Licensee shall pay to PLAYERS INC no later than the last day of such period an amount equal to the difference between the amount specified in this Paragraph 15(E) for such period and the amount actually spent by Licensee during such period on approved activities.

(E)    Licensee covenants that it will pay all awards to consumers entitled to receive them according to the representations of Licensee and the rules of the Licensed Product(s).

## 16.    TERMINATION

(A)    If Licensee shall violate any of its other obligations under the terms of this Agreement, PLAYERS INC shall have the right to terminate this Agreement upon thirty (30) days' notice in writing, and such notice of termination shall become effective unless Licensee shall completely remedy the violation within the thirty (30) day period and shall provide reasonable proof to PLAYERS INC that such violation has been remedied. If this Agreement is terminated under this paragraph, all royalties theretofore accrued shall become due and payable immediately to PLAYERS INC, and PLAYERS INC shall not be obligated to reimburse Licensee for any royalties paid by Licensee to PLAYERS INC.

(B)    Failure to resort to any remedies referred to herein shall not be construed as a waiver of any other rights and remedies to which PLAYERS INC is entitled under this Agreement or otherwise.

(C)    If PLAYERS INC commits a material breach of any material term of this Agreement and fails to cure such default and furnish reasonable proof of its cure to Licensee within thirty (30) days after receiving written notice of breach, Licensee shall have the right to terminate this Agreement by giving written notice to PLAYERS INC without any liability for additional unaccrued fees. In addition, without Licensee waiving any

rights to any damages hereunder, PLAYERS INC will provide Licensee with a pro rated refund based on the termination date.

(D) Upon the natural expiration of this Agreement and provided both parties have met their respective obligations contained herein, the parties agree that they will negotiate in good faith in an effort to come to terms on a new license agreement.

17. PARTNERSHIP. Nothing herein contained shall be construed to place PLAYERS INC and Licensee in the relationship of partners or joint venturers, and Licensee shall have no power to obligate or bind PLAYERS INC in any manner whatsoever.

18. WAIVER AND/OR MODIFICATION. None of the terms of this Agreement shall be waived or modified except by an express agreement in writing signed by both parties. There are no representations, promises, warranties, covenants or undertakings other than those contained in this Agreement, which represents the entire understanding of the parties. No written waiver shall excuse the performance of an act other than those specified therein. The failure of either party hereto to enforce, or delay by either party in enforcing any of its rights under this Agreement shall not be deemed a continuing waiver or modification thereof and either party may, within the time provided by applicable law, commence appropriate legal proceedings(s) to enforce any or all of such rights.

19. NON-ASSIGNABILITY. This Agreement and all rights and duties hereunder are personal to Licensee and shall not, without written consent of PLAYERS INC, be assigned, mortgaged, sublicensed or otherwise encumbered by Licensee or by operation of law to any other person, or entity. Such other encumbrance shall include, without limitation, distribution agreements, cobranding agreements, or agreements to provide a fantasy football software engine utilizing the trademarks and names of PLAYERS INC or the identity of any NFL player listed in the Player Agreement Report, with any other person or entity. Upon any such attempted unapproved assignment, mortgage, license, sublicense or other encumbrance, this Agreement shall terminate and all rights granted to Licensee hereunder shall immediately revert to PLAYERS INC. In addition, PLAYERS INC may terminate this Agreement, at its sole discretion, in the event that Licensee is merged, consolidated, transfers all or substantially all of its assets, or implements or suffers any material change in executive management or control, or upon any transfer of more than twenty-five percent (25%) of its voting control. If, in its sole discretion, PLAYERS INC shall exercise such termination, all rights granted to Licensee hereunder shall immediately revert to PLAYERS INC.

20. CONSTRUCTION. This Agreement shall be governed by, and shall be construed in accordance with the laws of the State of New York of the United States of America. The parties consent to jurisdiction under the State of New York and designate the courts of the State of New York as the venue for any dispute arising out of, under or relating to this Agreement.

[signature page to follow]

EXECUTION

8

21. **ENTIRE AGREEMENT.** This Agreement is the complete and exclusive agreement between the parties with respect to the subject matter hereof, superseding any prior agreements and communications (both written and oral) regarding such subject matter. Without limiting the foregoing, the parties expressly acknowledge and agree that: (A) Section 11(A) of the Agreement between SportsLine USA, Inc. and National Football League Player's Incorporated and dated June 30, 1995 is null and void ab initio; (B) Section 10(A) of the Agreement between SportsLine USA, Inc. and National Football League Player's Incorporated and dated July 1, 1999 is null and void ab initio; (C) Section 10(A) of the Agreement between SportsLine.com, Inc. and National Football League Player's Incorporated and dated February 28, 2003 is null and void ab initio; and (D) Section 10(A) of the Agreement between SportsLine.com, Inc. and National Football League Player's Incorporated with an effective date of March 1, 2006 is null and void ab initio.

IN WITNESS WHEREOF, the parties hereto have signed this Agreement as of the day and date written first above.

The Foregoing is Acknowledged:

NATIONAL FOOTBALL LEAGUE
PLAYERS INCORPORATED

By: _____

Title: _____COO_____

CBS INTERACTIVE INC.

By: _____

Title: _C.OO, Exp_____
Steve Snyder

**ATTACHMENT A**

TEAM: _____

## NFL PLAYERS ASSOCIATION
## GROUP LICENSING ASSIGNMENT

The undersigned player, a member of the National Football League Players Association ("NFLPA"), hereby assigns to the NFLPA and its licensing affiliates, if any, the exclusive right to use and to grant to persons, firms or corporations (collectively "licensees") the right to use his name, signature facsimile, voice, picture, photograph, likeness and/or biographical information (collectively "image") in group licensing programs. Group licensing programs are defined as those licensing programs in which a licensee utilizes a total of six (6) or more NFL player images in conjunction with or on products that are sold at retail or used as promotional or premium items. The undersigned player retains the right to grant permission to a licensee to utilize his image if that licensee is not concurrently utilizing the images of five (5) or more other NFL players in conjunction with or on products that are sold at retail or are used as promotional or premium items. If the undersigned player's inclusion in a particular NFLPA program is precluded by an individual exclusive endorsement agreement, and the undersigned player provides the NFLPA with timely notice of that preclusion, the NFLPA agrees to exclude the undersigned player from that particular program.

In consideration for this assignment of right, the NFLPA agrees to use the revenues it receives from group licensing programs to support the objectives as set forth in the By-laws of the NFLPA. The NFLPA further agrees to use its best efforts to promote the use of NFL player image in group licensing programs, to provide group licensing opportunities to all NFL players and to ensure that no entity engages in a group licensing program without first obtaining a license from the NFLPA. The NFLPA makes no representations regarding group licensing other than those expressed herein. This agreement shall be construed under New York law.

This assignment shall expire on December 31, 2009 and may not be revoked or terminated by the undersigned player until such date.

Dated:_____

_____
Player's Signature

Agreed to by the NFLPA:

_____
Player's Name (PLEASE PRINT)

_____
Name

_____
Title

EXECUTION                                   10

## ATTACHMENT B

### Wire Transfer Instructions

Please wire license fee payments to the following:

SUNTRUST BANK
1445 NEW YORK AVE., N.W.
WASHINGTON, D.C. 20005
Account Name: National Football League Players Inc
ABA/ Routing # : 061000104
Account #: 206691408

Tax id # 52-1874638

# EXHIBIT
# B



○ Web ● CBSSp



**⊙CBSSPORTS NFL**

Welcome, Julian [ Log out ]
Account | Community | Newsletters | Help

Home | Fantasy | NFL | MLB | NBA | NHL | College FB | College BK | Golf | More

Why can't I find my favc

NFL Home | Scoreboard | Standings | Schedules | Stats | Teams | Players | Transactions | Injuries | Video | Fantasy News

## 4 BRETT FAVRE, QB
Height/Weight: 6-2/222 | Birthdate: 10/10/1969 | Birthplace: Gulfport, MS, USA | Team: New York | College: Southern I

+Track This Player    Player Profile | Situational Stats | Game Log | Other QB | Roster | Jets Message Board

# Situational Stats

2005-06 · 2006-07 · 2007-08

**2006 Passing Splits**

| CAT | G | Att | Comp | Pct | Yds | YPA | Lg | TD | Int | 1st | 1st % |
|---|---|---|---|---|---|---|---|---|---|---|---|
| WINS | 8 | 301 | 174 | 57.8 | 2110 | 7.01 | 82 | 11 | 6 | 94 | 54. |
| LOSSES | 8 | 312 | 169 | 54.2 | 1775 | 5.69 | 48 | 7 | 12 | 88 | 52. |
| TIED | 0 | 83 | 53 | 63.9 | 650 | 7.83 | 75 | 4 | 1 | 29 | 54. |

| CAT | G | Att | Comp | Pct | Yds | YPA | Lg | TD | Int | 1st | 1st % |
|---|---|---|---|---|---|---|---|---|---|---|---|
| SUNDAY GAMES | 13 | 483 | 273 | 56.5 | 3129 | 6.48 | 82 | 17 | 11 | 150 | 54. |
| MONDAY GAMES | 2 | 80 | 44 | 55.0 | 471 | 5.89 | 48 | 1 | 5 | 20 | 45. |
| OTHER DAYS (NON MON/SUN) | 1 | 50 | 26 | 52.0 | 285 | 5.70 | 36 | 0 | 2 | 12 | 46. |

| CAT | G | Att | Comp | Pct | Yds | YPA | Lg | TD | Int | 1st | 1st % |
|---|---|---|---|---|---|---|---|---|---|---|---|
| SEPTEMBER GAMES | 3 | 120 | 71 | 59.2 | 850 | 7.08 | 75 | 6 | 3 | 40 | 56. |
| OCTOBER GAMES | 4 | 143 | 80 | 55.9 | 811 | 5.67 | 46 | 4 | 2 | 37 | 46. |
| NOVEMBER GAMES | 4 | 140 | 79 | 56.4 | 973 | 6.95 | 82 | 4 | 5 | 46 | 58. |
| DECEMBER GAMES | 5 | 210 | 113 | 53.8 | 1251 | 5.96 | 68 | 4 | 8 | 59 | 52. |

| CAT | G | Att | Comp | Pct | Yds | YPA | Lg | TD | Int | 1st | 1st % |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Monster Park | 1 | 34 | 22 | 64.7 | 293 | 8.62 | 68 | 2 | 0 | 12 | 54. |
| Ford Field | 1 | 36 | 25 | 69.4 | 340 | 9.44 | 75 | 3 | 0 | 15 | 60. |
| Hubert H. Humphrey Metrodome | 1 | 42 | 24 | 57.1 | 347 | 8.26 | 82 | 2 | 0 | 13 | 54. |
| Dolphin Stadium | 1 | 35 | 19 | 54.3 | 206 | 5.89 | 34 | 2 | 0 | 10 | 52. |
| Lambeau Field | 8 | 297 | 160 | 53.9 | 1656 | 5.58 | 48 | 6 | 10 | 79 | 49. |
| Lincoln Financial Field | 1 | 44 | 22 | 50.0 | 205 | 4.66 | 30 | 0 | 2 | 8 | 36. |
| Ralph Wilson Stadium | 1 | 47 | 28 | 59.6 | 287 | 6.11 | 25 | 1 | 2 | 19 | 67. |
| Soldier Field | 1 | 42 | 21 | 50.0 | 285 | 6.79 | 35 | 1 | 1 | 14 | 66. |
| Qwest Field | 1 | 36 | 22 | 61.1 | 266 | 7.39 | 48 | 1 | 3 | 12 | 54. |

**CAT**

| | G | Att | Comp | Pct | Yds | YPA | Lg | TD | Int | 1st | 1st % |
|---|---|---|---|---|---|---|---|---|---|---|---|
| VS. ARIZONA | 1 | 25 | 17 | 68.0 | 180 | 7.20 | 23 | 1 | 0 | 9 | 52. |
| VS. BUFFALO | 1 | 47 | 28 | 59.6 | 287 | 6.11 | 25 | 1 | 2 | 19 | 67. |
| VS. CHICAGO | 2 | 71 | 36 | 50.7 | 455 | 6.41 | 35 | 1 | 3 | 21 | 59. |
| VS. DETROIT | 2 | 73 | 45 | 61.6 | 514 | 7.04 | 75 | 3 | 3 | 24 | 53. |
| VS. MIAMI | 1 | 35 | 19 | 54.3 | 206 | 5.89 | 34 | 2 | 0 | 10 | 52. |
| VS. MINNESOTA | 2 | 92 | 50 | 54.3 | 632 | 6.87 | 82 | 2 | 2 | 25 | 50. |
| VS. NEW ENGLAND | 1 | 15 | 5 | 33.3 | 73 | 4.87 | 38 | 0 | 0 | 2 | 40. |
| VS. NEW ORLEANS | 1 | 55 | 31 | 56.4 | 340 | 6.18 | 48 | 3 | 1 | 18 | 58. |
| VS. NEW YORK JETS | 1 | 47 | 24 | 51.1 | 214 | 4.55 | 20 | 1 | 2 | 12 | 50. |
| VS. PHILADELPHIA | 1 | 44 | 22 | 50.0 | 205 | 4.66 | 30 | 0 | 2 | 8 | 36. |
| VS. SEATTLE | 1 | 36 | 22 | 61.1 | 266 | 7.39 | 48 | 1 | 3 | 12 | 54. |
| VS. SAN FRANCISCO | 1 | 34 | 22 | 64.7 | 293 | 8.62 | 68 | 2 | 0 | 12 | 54. |
| VS. ST. LOUIS | 1 | 39 | 22 | 56.4 | 220 | 5.64 | 46 | 1 | 0 | 10 | 45. |

**CAT**

| | G | Att | Comp | Pct | Yds | YPA | Lg | TD | Int | 1st | 1st % |
|---|---|---|---|---|---|---|---|---|---|---|---|
| VS AFC TEAMS | 4 | 144 | 76 | 52.8 | 780 | 5.42 | 44 | 4 | 4 | 43 | 56. |
| VS NFC TEAMS | 12 | 469 | 267 | 56.9 | 3105 | 6.62 | 82 | 14 | 14 | 139 | 52. |
| VS OWN DIVISION | 6 | 236 | 131 | 55.5 | 1601 | 6.78 | 82 | 6 | 8 | 70 | 53. |
| OUTSIDE OWN DIVISION | 10 | 377 | 212 | 56.2 | 2284 | 6.06 | 68 | 12 | 10 | 112 | 52. |

**CAT**

| | G | Att | Comp | Pct | Yds | YPA | Lg | TD | Int | 1st | 1st % |
|---|---|---|---|---|---|---|---|---|---|---|---|
| AHEAD BY 1-TO-8 POINTS | 0 | 174 | 93 | 53.4 | 1099 | 6.32 | 68 | 7 | 5 | 49 | 52. |
| AHEAD BY 9-TO-16 POINTS | 0 | 56 | 34 | 60.7 | 382 | 6.82 | 48 | 0 | 0 | 19 | 55. |
| AHEAD | 0 | 240 | 132 | 55.0 | 1518 | 6.33 | 68 | 7 | 5 | 69 | 52. |
| BEHIND BY 9-TO-16 POINTS | 0 | 142 | 74 | 52.1 | 866 | 6.10 | 82 | 3 | 5 | 38 | 51. |
| BEHIND BY 1-TO-8 POINTS | 0 | 83 | 54 | 65.1 | 586 | 7.06 | 46 | 3 | 3 | 32 | 59. |
| BEHIND | 0 | 290 | 158 | 54.5 | 1717 | 5.92 | 82 | 7 | 12 | 84 | 53. |

**CAT**

| | G | Att | Comp | Pct | Yds | YPA | Lg | TD | Int | 1st | 1st % |
|---|---|---|---|---|---|---|---|---|---|---|---|
| OWN 1-20 - BY YARD LINE | 0 | 67 | 36 | 53.7 | 406 | 6.06 | 82 | 1 | 2 | 15 | 41. |
| OWN 21-50 - BY YARD LINE | 0 | 298 | 180 | 60.4 | 2220 | 7.45 | 75 | 2 | 7 | 96 | 53. |
| OPP 49-20 - BY YARD LINE | 0 | 171 | 98 | 57.3 | 1089 | 6.37 | 48 | 6 | 5 | 55 | 56. |
| OPP 19-1 - BY YARD LINE | 0 | 77 | 29 | 37.7 | 170 | 2.21 | 13 | 9 | 4 | 16 | 55. |

**CAT**

| | G | Att | Comp | Pct | Yds | YPA | Lg | TD | Int | 1st | 1st % |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ON ARTIFICIAL SURFACES | 4 | 169 | 99 | 58.6 | 1179 | 6.98 | 82 | 6 | 4 | 55 | 55. |
| ON GRASS FIELDS | 12 | 444 | 244 | 55.0 | 2706 | 6.09 | 68 | 12 | 14 | 127 | 52. |
| INDOOR GAMES | 2 | 78 | 49 | 62.8 | 687 | 8.81 | 82 | 5 | 0 | 28 | 57. |
| OUTDOOR GAMES | 14 | 535 | 294 | 55.0 | 3198 | 5.98 | 68 | 13 | 18 | 154 | 52. |
| HOME GAMES | 8 | 297 | 160 | 53.9 | 1656 | 5.58 | 48 | 6 | 10 | 79 | 49. |
| ROAD GAMES | 8 | 316 | 183 | 57.9 | 2229 | 7.05 | 82 | 12 | 8 | 103 | 56. |
| AS STARTER | 0 | 0 | 0 | --- | 0 | --- | 0 | 0 | 0 | 0 | -- |

**CAT**

| | G | Att | Comp | Pct | Yds | YPA | Lg | TD | Int | 1st | 1st % |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ATTEMPTS 1-THROUGH-10 | 0 | 160 | 91 | 56.9 | 1202 | 7.51 | 75 | 5 | 3 | 52 | 57. |
| ATTEMPTS 11-THROUGH-20 | 0 | 155 | 88 | 56.8 | 1031 | 6.65 | 82 | 3 | 2 | 46 | 52. |
| ATTEMPTS 21-THROUGH-30 | 0 | 144 | 80 | 55.6 | 821 | 5.70 | 68 | 6 | 4 | 39 | 48. |
| ATTEMPTS 31+ | 0 | 154 | 84 | 54.5 | 831 | 5.40 | 42 | 4 | 9 | 45 | 53. |

**CAT**

| | G | Att | Comp | Pct | Yds | YPA | Lg | TD | Int | 1st | 1st % |
|---|---|---|---|---|---|---|---|---|---|---|---|
| FIRST DOWN | 0 | 228 | 119 | 52.2 | 1113 | 4.88 | 48 | 3 | 11 | 42 | 35. |
| SECOND DOWN | 0 | 194 | 117 | 60.3 | 1367 | 7.05 | 82 | 8 | 3 | 64 | 54. |
| THIRD DOWN | 0 | 184 | 105 | 57.1 | 1392 | 7.57 | 75 | 7 | 3 | 74 | 70. |
| FOURTH DOWN | 0 | 7 | 2 | 28.6 | 13 | 1.86 | 7 | 0 | 1 | 2 | 100. |

**CAT**

| | G | Att | Comp | Pct | Yds | YPA | Lg | TD | Int | 1st | 1st % |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1ST HALF | 0 | 306 | 175 | 57.2 | 2130 | 6.96 | 82 | 7 | 5 | 94 | 53. |
| 2ND HALF | 0 | 307 | 168 | 54.7 | 1755 | 5.72 | 68 | 11 | 13 | 88 | 52. |
| LAST TWO MINUTES OF HALF | 0 | 72 | 47 | 65.3 | 537 | 7.46 | 82 | 1 | 0 | 24 | 51. |

**CAT**

| | G | Att | Comp | Pct | Yds | YPA | Lg | TD | Int | 1st | 1st % |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1ST QUARTER | 0 | 134 | 75 | 56.0 | 956 | 7.13 | 75 | 6 | 2 | 40 | 53. |
| 2ND QUARTER | 0 | 172 | 100 | 58.1 | 1174 | 6.83 | 82 | 1 | 3 | 54 | 53. |
| 3RD QUARTER | 0 | 140 | 67 | 47.9 | 822 | 5.87 | 68 | 6 | 6 | 36 | 53. |

| CAT | G | Att | Comp | Pct | Yds | YPA | Lg | TD | Int | 1st | 1st % |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 4TH QUARTER | 0 | 167 | 101 | 60.5 | 933 | 5.59 | 46 | 5 | 7 | 52 | 51. |
| FOURTH QUARTER WITHIN 7 | 0 | 142 | 82 | 57.7 | 767 | 5.40 | 46 | 5 | 7 | 42 | 51. |
| OVERTIME | 0 | 0 | 0 | — | 0 | — | 0 | 0 | 0 | 0 | 0 |
| MARGIN 0-7 | 5 | 222 | 128 | 57.7 | 1532 | 6.90 | 82 | 9 | 3 | 68 | 53. |
| MARGIN 8-14 | 5 | 189 | 111 | 58.7 | 1226 | 6.49 | 68 | 6 | 8 | 62 | 55. |
| MARGIN 15+ | 6 | 202 | 104 | 51.5 | 1127 | 5.58 | 38 | 3 | 7 | 52 | 50. |

## 2006 Rushing Splits

| CAT | G | Att | Yds |
|---|---|---|---|
| WINS | 8 | 14 | -3 |
| LOSSES | 8 | 9 | 32 |
| TIED | 0 | 0 | 0 |

| CAT | G | Att | Yds |
|---|---|---|---|
| SUNDAY GAMES | 13 | 19 | 31 |
| MONDAY GAMES | 2 | 3 | -1 |
| OTHER DAYS (NON MON/SUN) | 1 | 1 | -1 |

| CAT | G | Att | Yds |
|---|---|---|---|
| SEPTEMBER GAMES | 3 | 2 | -5 |
| OCTOBER GAMES | 4 | 6 | 9 |
| NOVEMBER GAMES | 4 | 6 | -3 |
| DECEMBER GAMES | 5 | 9 | 28 |

| CAT | G | Att | Yds |
|---|---|---|---|
| Monster Park | 1 | 3 | -3 |
| Ford Field | 1 | 1 | -5 |
| Hubert H. Humphrey Metrodome | 1 | 2 | -2 |
| Dolphin Stadium | 1 | 1 | 14 |
| Lambeau Field | 8 | 11 | 26 |
| Lincoln Financial Field | 1 | 1 | 0 |
| Ralph Wilson Stadium | 1 | 2 | 0 |
| Soldier Field | 1 | 0 | 0 |
| Qwest Field | 1 | 2 | -1 |

| CAT | G | Att | Yds |
|---|---|---|---|
| VS. ARIZONA | 1 | 4 | -5 |
| VS. BUFFALO | 1 | 2 | 0 |
| VS. CHICAGO | 2 | 1 | 0 |
| VS. DETROIT | 2 | 3 | -6 |
| VS. MIAMI | 1 | 1 | 14 |
| VS. MINNESOTA | 2 | 3 | -3 |
| VS. NEW ENGLAND | 1 | 0 | 0 |
| VS. NEW ORLEANS | 1 | 0 | 0 |
| VS. NEW YORK JETS | 1 | 3 | 33 |
| VS. PHILADELPHIA | 1 | 1 | 0 |
| VS. SEATTLE | 1 | 2 | -1 |
| VS. SAN FRANCISCO | 1 | 3 | -3 |
| VS. ST. LOUIS | 1 | 0 | 0 |

| CAT | G | Att | Yds |
|---|---|---|---|
| VS AFC TEAMS | 4 | 6 | 47 |
| VS NFC TEAMS | 12 | 17 | -18 |
| VS OWN DIVISION | 6 | 7 | -9 |
| OUTSIDE OWN DIVISION | 10 | 16 | 38 |

| CAT | G | Att | Yds |
|---|---|---|---|
| AHEAD BY 1-TO-8 POINTS | 0 | 8 | 9 |
| AHEAD BY 9-TO-16 POINTS | 0 | 6 | -8 |
| AHEAD | 0 | 16 | -4 |
| BEHIND BY 9-TO-16 POINTS | 0 | 1 | 0 |
| BEHIND BY 1-TO-8 POINTS | 0 | 3 | 0 |

| CAT | G | Att | Yds |
|---|---|---|---|
| BEHIND | 0 | 7 | 33 |

| CAT | G | Att | Yds |
|---|---|---|---|
| OWN 1-20 - BY YARD LINE | 0 | 2 | -1 |
| OWN 21-50 - BY YARD LINE | 0 | 10 | 36 |
| OPP 49-20 - BY YARD LINE | 0 | 5 | -3 |
| OPP 19-1 - BY YARD LINE | 0 | 6 | -3 |

| CAT | G | Att | Yds |
|---|---|---|---|
| ON ARTIFICIAL SURFACES | 4 | 6 | -7 |
| ON GRASS FIELDS | 12 | 17 | 36 |
| INDOOR GAMES | 2 | 3 | -7 |
| OUTDOOR GAMES | 14 | 20 | 36 |
| HOME GAMES | 8 | 11 | 26 |
| ROAD GAMES | 8 | 12 | 3 |
| AS STARTER | 0 | 0 | 0 |

| CAT | G | Att | Yds |
|---|---|---|---|
| ATTEMPTS 1-THROUGH-10 | 0 | 23 | 29 |
| ATTEMPTS 11-THROUGH-20 | 0 | 0 | 0 |
| ATTEMPTS 21-THROUGH-30 | 0 | 0 | 0 |
| ATTEMPTS 31+ | 0 | 0 | 0 |

| CAT | G | Att | Yds |
|---|---|---|---|
| FIRST DOWN | 0 | 12 | 4 |
| SECOND DOWN | 0 | 7 | 31 |
| THIRD DOWN | 0 | 2 | -5 |
| FOURTH DOWN | 0 | 2 | -1 |

| CAT | G | Att | Yds |
|---|---|---|---|
| 1ST HALF | 0 | 8 | -2 |
| 2ND HALF | 0 | 15 | 31 |
| LAST TWO MINUTES OF HALF | 0 | 12 | 3 |

| CAT | G | Att | Yds |
|---|---|---|---|
| 1ST QUARTER | 0 | 2 | 0 |
| 2ND QUARTER | 0 | 6 | -2 |
| 3RD QUARTER | 0 | 3 | 24 |
| 4TH QUARTER | 0 | 12 | 7 |
| FOURTH QUARTER WITHIN 7 | 0 | 5 | 21 |
| OVERTIME | 0 | 0 | 0 |

| CAT | G | Att | Yds |
|---|---|---|---|
| MARGIN 0-7 | 5 | 4 | -8 |
| MARGIN 8-14 | 5 | 10 | 9 |
| MARGIN 15+ | 6 | 9 | 28 |

ADS BY GOOGLE

**Watch Live NCAA Football**
Watch NFL & College Football Games Live online
Watch-Football-Live.com

**Ncaa Football Standings**
Get Updated NCAA Standings, Scores, & Videos w/the Free Sports Toolbar
Sports.alottoolbars.com

**Expedia and the NFL**
Get to the game with Expedia Official travel team of the NFL
www.Expedia.com

Fantasy Football at CBSSports.com

**CBSSPORTS.com**
SPiN
CBS Sports TV
Video
Community
Mobile
TV Listings
Weather
Shop
Ringtones/Wallpapers
Tickets
My Profile
My Scores
Bleacher Report
Westwood One

**NFL FOOTBALL**
Scoreboard
Standings
Schedules
Stats
Teams
Players
Transactions
Injuries
Draft
History

**EXCLUSIVE FEATURES**
Expert Picks
Harmon Forecast
Head to Head
NFL on CBS
NFL Today
Player Rankings
Power Rankings
Rumors

**FEATURED LINKS**
Alerts
Blogs
Columns
Contests
Daily Line
Glossary
Message Board
Newsletters
Photos
Podcasts
RSS Feeds
Widgets

**FANTASY FOOTBALL**
Fantasy Football News
Fantasy Football Games
Message Board
Video

Popular on CBS sites: Fantasy Football | Miley Cyrus | MLB | iPhone 3G | GPS | Recipes | Shwayze | NFL

About CBSSports.com | Advertise | User Feedback | Site Map

© 2008 CBS Interactive. All rights reserved. | Privacy Policy | Terms of Use

CBS Sports is a registered trademark of CBS Broadcasting Inc. SportsLine is a registered service mark of SportsLine.com, Inc.



RANKED #1 IN RELIABILITY
AND VOTED BEST COMMISSIONER PRODUCT
TRY IT
FREE TODAY



○ Web  ◉ CBSSp

Comcast HD. More. More.

| Home | Fantasy | NFL | MLB | NBA | NHL | College FB | College BK | Golf | More |

Why can't I find my favo
LEARN MORE

NFL Home · Scoreboard · Standings · Schedules · Stats · Teams · Players · Transactions · Injuries · Video · Fantasy News

# Stats

**Preseason · Regular Season**

## League Leaders

**Michael Turner**

| Rushing | Yds |
|---|---|
| 1. M. Turner ATL | 220 |
| 2. W. Parker PIT | 138 |
| 3. M. Forte CHI | 123 |
| 4. B. Jacobs NYG | 116 |
| 5. T. Jones NYJ | 101 |

**Complete Leaders**

**Donovan McNabb**

| Passing |
|---|
| 1. D. McNabb PHI |
| 2. D. Brees NO |
| 3. T. Romo DAL |
| 4. J. Kitna DET |
| 5. P. Manning IND |

**Complete Leaders**

**Plaxico Burress**

| Receiving | Yds |
|---|---|
| 1. P. Burress NYG | 133 |
| 2. R. Moss NE | 116 |
| 3. R. Bush NO | 112 |
| 4. A. Johnson HOU | 112 |
| 5. C. Johnson DET | 107 |

**Complete Leaders**

**James Harrison**

| Sacks |
|---|
| 1. J. Harrison PIT |
| 2. J. Abraham ATL |
| 3. P. Haralson SF |
| 4. M. Vrabel NE |
| 5. B. Thomas NYJ |

**Complete Leaders**

## Other League Leaders

**Choose Stat:**

- ◉ Passing yards
- ○ Rushing yards
- ○ Interceptions
- ○ Tackles
- ○ Scoring
- ○ Total Touchdowns
- ○ Field Goals
- ○ Passer Rating
- ○ Touchdown Passes

- ○ Receiving yards
- ○ Sacks
- ○ Kickoff Returns
- ○ Punt Returns
- ○ Punting
- ○ Fumble Recoveries
- ○ Receptions
- ○ Receiving Touchdowns
- ○ Rushing Touchdowns

**2. Filter By:**  ⦿ Complete NFL  ◯ NFC  ◯ AFC

**3. Submit Query:**  [ Find Stats ]

## Sortable Team Rankings

**1. Choose:**  ⦿ Offense  ◯ Defense

**2. Select Category:**
- ⦿ Total
- ◯ Scoring
- ◯ Rushing
- ◯ Passing
- ◯ Receiving
- ◯ Turnovers
- ◯ Punting
- ◯ Kickoffs
- ◯ Kick Returns

**3. Select Stat:**
- Total Offense
- Total First Downs
- 3rd Down Conversions
- 4th Down Conversions
- Time of Possession
- Penalties
- Penalty Yards
- Fumbles
- Fumbles Lost

**4. Filter By:**  ⦿ Complete NFL  ◯ NFC  ◯ AFC

**5. Submit Query:**  [ Find Stats ]

## Sortable Player Rankings

**1. Choose Position:**
- ⦿ Quarterback
- ◯ Running Back
- ◯ Wide Receiver
- ◯ Tight End
- ◯ Defensive Linemen
- ◯ Linebacker

- ◯ Defensive Back
- ◯ Kicker
- ◯ Kickoff Returner
- ◯ Punter
- ◯ Punt Returner
- ◯ Field Goal Kicker

**2. Filter By:**  ⦿ Complete NFL  ◯ NFC  ◯ AFC

**3. Submit Query:**  [ Find Stats ]

## Team-by-Team Stats

### American Football Conference
**East**
- New York Jets
- Buffalo Bills
- Miami Dolphins
- New England Patriots

**North**
- Baltimore Ravens
- Cincinnati Bengals

### National Football Conference
**East**
- Dallas Cowboys
- New York Giants
- Philadelphia Eagles
- Washington Redskins

**North**
- Chicago Bears
- Detroit Lions

Cleveland Browns
Pittsburgh Steelers
**South**
Houston Texans
Indianapolis Colts
Jacksonville Jaguars
Tennessee Titans
**West**
Denver Broncos
Kansas City Chiefs
Oakland Raiders
San Diego Chargers

Green Bay Packers
Minnesota Vikings
**South**
Atlanta Falcons
Carolina Panthers
New Orleans Saints
Tampa Bay Buccaneers
**West**
Arizona Cardinals
St. Louis Rams
San Francisco 49ers
Seattle Seahawks

ADS BY GOOGLE

**Watch Live Football Games**
Watch NFL & College Football Games Live online
Watch-Football-Live.com

**Watch The US Open Live**
Watch Live Tennis Matches Online including the US Open
Watch-Sports-Live.net/Tennis

**2008 NFL Season Stats**
Get Updated NFL Schedules, Video & Scores w/the Free Sports Toolbar
Sports.alottoolbars.com

Fantasy Football at CBSSports.com

**CBSSPORTS.com**
SPiN
CBS Sports TV
Video
Community
Mobile
TV Listings
Weather
Shop
Ringtones/Wallpapers
Tickets
My Profile
My Scores
Bleacher Report
Westwood One

**NFL FOOTBALL**
Scoreboard
Standings
Schedules
Stats
Teams
Players
Transactions
Injuries
Draft
History

**EXCLUSIVE FEATURES**
Expert Picks
Harmon Forecast
Head to Head
NFL on CBS
NFL Today
Player Rankings
Power Rankings
Rumors

**FEATURED LINKS**
Alerts
Blogs
Columns
Contests
Daily Line
Glossary
Message Board
Newsletters
Photos
Podcasts
RSS Feeds
Widgets

**FANTASY FOOTBALL**
Fantasy Football News
Fantasy Football Games
Message Board
Video

Popular on CBS sites: Fantasy Football | Miley Cyrus | MLB | iPhone 3G | GPS | Recipes | Shwayze | NFL

About CBSSports.com | Advertise | User Feedback | Site Map

© 2008 CBS Interactive. All rights reserved. | Privacy Policy | Terms of Use

# EXHIBIT C

## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| CBS INTERACTIVE INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No.: _____ |
| ) | |
| v. ) | |
| ) | JURY TRIAL DEMANDED |
| NATIONAL FOOTBALL LEAGUE ) | |
| PLAYERS ASSOCIATION, ) | |
| ) | |
| Defendant. ) | |
| ) | |
| _____ ) | |

## COMPLAINT

Plaintiff, CBS Interactive Inc. ("CBS Interactive"), operating through its division

CBSSports.com ("CBSSports.com"), as and for its complaint against Defendant, National

League Football Payers Association ("the Players Association"), states:

## INTRODUCTION

1.    CBS Interactive, through its business division, CBSSports.com, is a leader

in providing fantasy sports games to sports enthusiasts throughout the country, including in one

of its top markets, Minnesota. The Players Association has threatened and continues to threaten

CBS Interactive with litigation if CBS Interactive does not pay the Players Association

nationwide license fees for the use of publicly available statistics. It has gone so far as to say

that if CBS Interactive takes any action to challenge its right to the licensing fees, it will never

again grant CBSSports.com rights necessary to operate fantasy games and will therefore put

CBSSports.com out of the fantasy football business. It has taken these actions even though the

Eighth Circuit has decided the exact issues in protracted litigation resolved earlier this year that

went all the way to the United States Supreme Court, and despite the fact that the Players Association actively participated in that litigation as an *amicus curiae* at both the Eighth Circuit and United States Supreme Court levels. The Players Association claims that decision does not prevent it from continuing its efforts to collect nationwide monopoly royalty fees.

2.      CBS Interactive seeks a declaration and a reaffirmation that the Players Association may not seek to control the use of player statistics in fantasy games and may not continue to extract money from CBS Interactive for the use of publicly available football statistics. In this regard, the Players Association has threatened to put CBSSports.com out of the fantasy football business. This not only implicates CBSSports.com's business but also the business of the hundreds of other fantasy game operators that are put in a position of either paying unwarranted licensing fees or facing expensive litigation against the Players Association and potentially losing their business. To this end, CBS Interactive also seeks a ruling that the Players Association has been and is engaging in prohibited antitrust activity under §2 of the Sherman Act.

## THE PARTIES

3.      CBS Interactive is a Delaware corporation and does business throughout the United States, including within the State of Minnesota. It is headquartered at 235 Second Street, San Francisco, California 94105, with offices in California, Florida, Kentucky, New York, Georgia, Michigan and Illinois, among others.

4.      CBS Interactive operates fantasy sports games at the domain CBSSports.com. CBSSports.com is one of the leading providers of fantasy sports products and services in the United States. The organization currently offers a variety of fantasy games (e.g., commissioner style) for different sports, including football, baseball, basketball, hockey, and golf

that can be played via a variety of interactive platforms, including the Internet, Interactive TV and Mobile.

5.    On information and belief, the Players Association is an unincorporated association that acts as the union for players in the National Football League, including players for the Minnesota Vikings, a National Football League franchise that plays its home games in the State of Minnesota. On information and belief, the Players Association has over 2,000 members nationwide, including members working and residing within this judicial district.

## BACKGROUND

6.    Currently, participation in fantasy sports games is a multimillion dollar industry in the United States. The typical model for a fantasy sports game is one in which each participant becomes the "owner" of his/her own fantasy franchise. A mock draft occurs prior to the beginning of the professional season associated with each game. For example, prior to the start of the professional football season, a participant will form his team by drafting players from a pool of available professional football players. Players are drafted onto the participant's team based on the participant's notion that the player will perform well during the course of the football season. During the course of the season the participant may modify his or her roster by making trades with other participants or by adding new players that become available from other teams.

7.    Typically, each participant or "owner" is competing against other fantasy owners within the league who have drafted their own teams. The success of one's fantasy team over the course of the football season is dependent on the chosen players' actual performances on their respective actual teams. Usually, the publicly available statistics relating to each player and team are tracked and posted to determine which fantasy team is winning, as well as to aid

participants in choosing who to play on a given day, who to trade, etc. . . . Success is based on the selection of players that are likely to yield the best statistics, which, often times, is not the most notable players. In short, it is a statistics driven game.

8.    CBS Interactive has owned and operated fantasy sports games businesses since 1996. CBS Interactive offers fantasy sports games, including fantasy football, to participants throughout the United States, including to participants in the State of Minnesota.

9.    CBS Interactive, through CBSSports.com currently offers a variety of fantasy games, including baseball, football, basketball, hockey, and golf. For each sport, CBSSports.com provides participants with profiles and publicly available statistics for each player so that participants can make informed decisions regarding their fantasy teams.

10.    CBS Interactive had formerly entered into multiple licensing agreements with the Players Association, through its licensing entity, National Football League Player Incorporated. The most recent licensing agreement was effective on or about March 1, 2007 and expired on February 29, 2008.

11.    Between the months of February and August 2008, CBS Interactive was approached by the Players Association to discuss, among other things, CBS Interactive's continued use, during the upcoming football season, of names and statistics related to professional football players. The Players Association demanded licensing fees for continued use of names and statistics related to professional football players, in which the Players Association asserted intellectual property rights.

12.    Even though this very issue had recently been decided during the past year in the Eighth Circuit Court of Appeals, the Players Association informed CBS Interactive that failure to pay the demanded licensing fees would be met with litigation. The Players Association

4

further asserted that any party that elects to challenge the Players Association's alleged rights in the names and statistics of professional football players would be *excluded* from the fantasy football market.

13.    Based on these discussions, CBS Interactive fears that it will be sued by the Players Association or that the Players Association will publicly contend that CBS Interactive is violating its rights. Specifically, the Players Association has maintained that it has exclusive ownership rights in the basic information comprising public statistics associated with the players' names and that it can therefore preclude all fantasy football sports league providers from using this basic public statistical information to provide these games to the consuming public and sports enthusiasts.

## JURISDICTION AND VENUE

14.    The Court has subject matter jurisdiction over this cause of action pursuant to 28 U.S.C. §§1331, 1338, 1367, 2201, and 2202, as well as, 15 U.S.C. §§1 *et seq.*, and 17 U.S.C. §§101 *et seq.*

15.    On information and belief, the Players Association is an unincorporated association with members who reside in Minnesota and is subject to personal jurisdiction in this judicial district.

16.    Venue is proper in this district pursuant to 28 U.S.C. §1391.

## COUNT I

### DECLARATORY JUDGMENT THAT A RIGHT OF PUBLICITY INTERPRETED BROADLY ENOUGH TO ENCOMPASS CBS INTERACTIVE'S ACTIONS IS SUPERSEDED BY THE FIRST AMENDMENT TO THE U.S. CONSTITUTION

17.    Plaintiff realleges and incorporates by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

18.     CBS Interactive brings this action for declaratory judgment pursuant to 28

U.S.C. §§2201 and 2202, as to the relevant rights, liabilities, and obligations of CBS Interactive

and the Players Association with respect to common law and statutory rights of publicity

recognized within the United States.

19.     To the extent that a right of publicity recognized within the United States

is violated or infringed by CBS Interactive's operation of a sports fantasy games business, the

First Amendment to the U.S. Constitution supersedes the right of publicity.

## COUNT II

### DECLARATORY JUDGMENT THAT A RIGHT OF PUBLICITY
### INTERPRETED BROADLY ENOUGH TO ENCOMPASS CBS INTERACTIVE'S
### ACTIONS IS PREEMPTED BY FEDERAL COPYRIGHT LAW

20.     Plaintiff realleges and incorporates by reference the allegations set forth in

the preceding paragraphs as if fully set forth herein.

21.     CBS Interactive brings this action for declaratory judgment pursuant to 28

U.S.C. §§2201 and 2202, as to the relevant rights, liabilities, and obligations of CBS Interactive

and the Players Association with respect to common law and statutory rights of publicity

recognized within the United States.

22.     To the extent that a right of publicity recognized within the United States

is violated or infringed by CBS Interactive's operation of a sports fantasy games business,

federal Copyright Law, which dedicates information used in a fantasy sports games business to

the public, preempts the right of publicity.

6

## COUNT III

## DECLARATORY JUDGMENT THAT CBS INTERACTIVE DOES NOT VIOLATE ANY RIGHT OF PUBLICITY OWNED OR CONTROLLED BY THE PLAYERS ASSOCIATION

23.    Plaintiff realleges and incorporates by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

24.    CBS Interactive brings this action for declaratory judgment pursuant to 28 U.S.C. §§2201 and 2202, as to the relevant rights, liabilities, and obligations of CBS Interactive and the Players Association with respect to any alleged right of publicity owned or controlled by the Players Association.

25.    CBS Interactive's actions in operating a sports fantasy league business do not infringe any right of publicity allegedly owned or controlled by the Players Association.

## COUNT IV

## MONOPOLIZATION AND ATTEMPTED MONOPOLIZATION IN VIOLATION OF §2 OF THE SHERMAN ACT, 15 U.S.C. §2

26.    Plaintiff realleges and incorporates by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

27.    CBS Interactive provides fantasy football leagues throughout the United States, including Minnesota, in which publicly available names and statistics related to professional football players are used.

28.    The creation and maintenance of fantasy football games, and the provision of related information services, constitutes a relevant product or service market.  Consumers do not consider fantasy games for other sports to be a substitute for fantasy football.

29.    The relevant geographic market is the United States.

7

30.     The Players Association seeks to monopolize and has attempted to monopolize the market for creation and maintenance of fantasy football games and the provision of related information services. The Players Association seeks to extract monopoly profits from the entire industry by charging licensing fees for the use of publicly available information and, on information and belief, threatening objectively baseless litigation against businesses that do not succumb to its demands.

31.     For example, between the months of February and August of 2008 CBS Interactive was contacted by the Players Association, through its representatives, to discuss, among other things, CBS Interactive's continued use, during the upcoming football season, of publicly available names and statistics related to professional football players. In this relevant time period and, for example, on or about May 21, 2008, the Players Association, through its representatives, demanded licensing fees for the continued use of the names and statistics of football players, over which the Players Association asserted intellectual property rights. Further, on or about August 6, 2008, the Players Association, through its representatives, went so far as to indicate that if CBS Interactive challenged its asserted intellectual property rights, the Players Association would refuse a license to CBS Interactive moving forward and thereby exclude CBS Interactive from the fantasy football market. In the same communication, the Players Association referred to itself as a "litigious organization."

32.     During the relevant time period and through today, the Player Association knew or reasonably should have known that names and statistics related to professional football players are protected free speech under the First Amendment to the United States Constitution. *See Zacchini v. Scripps-Howard Broadcasting Co.*, 433 U.S. 562 (1977); *C.B.C. Distribution and Marketing, Inc. v. Major League Baseball*, 505 F.3d 818 (8th Cir. 2007). Indeed, the Players

Association actively participated as an *amicus curiae* in the case that resolved this issue at the Eighth Circuit and United States Supreme Court levels, *C.B.C. Distribution and Marketing, Inc. v. Major League Baseball*, 505 F.3d 818 (8th Cir. 2007), *cert denied*, 128 S.Ct. 2872 (2008).

33.     Despite the clarity of the law on this issue, and despite its arguments having been fully considered in the recent litigation, the Players Association continues to make objectively baseless demands for licensing fees from CBS Interactive and others in the fantasy football industry.  The Players Association maintains this demand even though in its briefs to the Eighth Circuit Court of Appeals and the United States Supreme Court in the above-referenced *C.B.C. Distribution and Marketing, Inc.* case, the Player Association correctly recognized that the outcome of that case would impact its ability to demand licensing fees for the use of publicly available information.  For example, in its brief to the United States Supreme Court, the Players Association asserted that the "Eighth Circuit's decision has consequences for the entire fantasy sports industry," and the Players Association "will be especially hard hit by the decision below." Motion for Leave to File Amici Curiae Brief and Brief for National Football League Players Association and National Football League Players Incorporated as Amici Curiae in Support of Petitioners at pages 15 and 16.

34.     Despite the above, the Players Association has continued to demand licensing fees for the use of players' names and statistics in fantasy football games throughout the United States, including within the Eighth Circuit and this judicial district.  In view of the above, the Players Association's asserted ownership of, and control over, the names and statistics used in fantasy football games is objectively baseless and constitutes an unlawful monopolization and/or attempted monopolization over the relevant markets.

35.    In pursuing unwarranted licensing fees in this manner, the Players Association has threatened CBS Interactive with litigation for an improper and malicious purpose, without an objectively reasonable basis in law, and with a specific intent to harm competition and monopolize the relevant markets.

36.    On information and belief, the Players Association is demanding licensing fees from other fantasy football providers, and taking similar actions with other companies that are not paying the requested licensing fees. By threatening litigation, the Players Association attempts to coerce payment of licensing fees, regardless of the propriety of its assertion of rights.

37.    The Players Association has thereby either succeeded in monopolizing the relevant market or has created a dangerous probability of achieving monopoly power in the relevant markets, despite the absence of any appropriate legal basis for doing so.

38.    The Players Association's improper conduct threatens to reduce the availability of fantasy football games, to raise prices for fantasy football customers, to restrain the dissemination of information related to professional football, and to exclude CBS Interactive from the relevant markets.  Accordingly, the Players Association, in violation of §2 of the Sherman Act, has monopolized or attempted to monopolize and continues to monopolize or attempt to monopolize the relevant markets.

39.    On information and belief, as a direct result of the Players Association's illegal conduct, CBS Interactive is being injured and/or will be injured, including in spending time and money defending itself against the Players Association's baseless claim to nationwide property rights, notwithstanding the Eighth Circuit's decision.  The Players Association's threats and assertion of monopoly rights also are likely to disrupt the overall market.

10

40.    On information and belief, the Players Association's illegal conduct, unless enjoined, will continue to cause irreparable injury and loss to CBS Interactive and the entire fantasy football market, for which there is no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, CBS Interactive respectfully requests this Court to enter a judgment:

A.    Declaring that, to the extent Plaintiff CBS Interactive's actions related to its business of providing and running sports fantasy teams violates any right of publicity, the First Amendment to the U.S. Constitution supersedes the right of publicity;

B.    Declaring that, to the extent Plaintiff CBS Interactive's actions related to its business of providing and running sports fantasy teams violates any state law right of publicity, federal Copyright Law preempts the state law right of publicity;

C.    Declaring that Plaintiff CBS Interactive's actions related to its business of providing and running sports fantasy teams do not violate any right to publicity allegedly possessed or controlled by Defendant Players Association or any business associated with the Players Association;

D.    Declaring that Defendant Players Association's conduct is in violation of §2 of the Sherman Act, 15 U.S.C. §2;

E.    Awarding the Plaintiff CBS Interactive, pursuant to §4 of the Clayton Act, 15 U.S.C. §15, any actual and treble damages, attorneys' fees and costs;

F.    Enjoining Defendant Players Association, their agents, servants, employees, attorneys, and affiliates, and those persons or entities in active concert or participation with them who receive actual notice of the order by personal service or otherwise, from interfering with Plaintiff CBS Interactive's business related to sports fantasy teams, either directly through action

11

against Plaintiff CBS Interactive or indirectly through actions against businesses who contract

with Plaintiff CBS Interactive for sports fantasy team related products, or from threatening

litigation or otherwise making statements that Plaintiff CBS Interactive and/or Plaintiff CBS

Interactive's customers have infringed or are infringing any rights of Defendant Players

Association, pursuant to §16 of the Clayton Act, 15 U.S.C. §26;

     G.    Awarding the Plaintiff CBS Interactive its reasonable costs and expenses,

including attorneys' fees, incurred;

     H.    Awarding the Plaintiff CBS Interactive all pre- and post- judgment interest

allowed by law; and

     I.    Awarding the Plaintiff CBS Interactive any other relief that this Court deems just

and proper.

Dated: September __3__, 2008         DORSEY & WHITNEY LLP

                       By  _____

                             Michael A. Lindsay #0163466
                        Suite 1500, 50 South Sixth Street
                        Minneapolis, MN 55402-1498
                        Telephone:  (612) 340-2600

                        *Attorneys for Plaintiff CBS Interactive Inc.*

OF COUNSEL

Rudolph A. Telscher, Jr.
HARNESS, DICKEY & PIERCE, P.L.C.
7700 Bonhomme, Suite 400
St. Louis, MO 63105
(314) 726-7500
FAX:  (314) 726-7501

JS 44 (Rev. 12/07)   **CIVIL COVER SHEET**

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| CBS INTERACTIVE, INC. | NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION |

**(b)** County of Residence of First Listed Plaintiff    City of San Francisco
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Michael A. Lindsay, Dorsey & Whitney, LLP, 50 South Sixth Street, Suite 1500, Minneapolis, MN  55402  612-340-7819

Attorneys (If Known)

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

- ☐ 1  U.S. Government Plaintiff
- ☒ 3  Federal Question (U.S. Government Not a Party)
- ☐ 2  U.S. Government Defendant
- ☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                                    and One Box for Defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | **PERSONAL INJURY** | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☒ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 362 Personal Injury - Med. Malpractice | ☐ 625 Drug Related Seizure of Property 21 USC 881 | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 365 Personal Injury - Product Liability | ☐ 630 Liquor Laws | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 640 R.R. & Truck | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | | ☐ 650 Airline Regs. | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | ☐ 660 Occupational Safety/Health | ☐ 830 Patent | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 690 Other | ☐ 840 Trademark | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/Exchange |
| ☐ 195 Contract Product Liability | | ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | ☐ 900Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - Alien Detainee | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions | | |

**V. ORIGIN** (Place an "X" in One Box Only)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 USC 1331 and 1367; 15 U.S.C. § 1 et seq.
Brief description of cause:
Attempted Monopolization in violation of Sherman Act

**VII. REQUESTED IN COMPLAINT:**
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $ _____
CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

**VIII. RELATED CASE(S) IF ANY**
(See instructions):    JUDGE _____    DOCKET NUMBER _____

DATE   Sept. 3, 2008
SIGNATURE OF ATTORNEY OF RECORD   _Michael Lindsay_

FOR OFFICE USE ONLY

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

# 08-22504-CIV-MOORE/SIMONTON

**JS 44** (Rev. 2/08)

## CIVIL COVER SHEET

**SEPT 09, 2008**

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.) **NOTICE: Attorneys MUST Indicate All Re-filed**

### I. (a) PLAINTIFFS

National Football League Players Incorporated

**(b)** County of Residence of First Listed Plaintiff  Washington D.C.
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Christopher E. Knight, Esq., Fowler White Burnett, P.A., 1395 Brickell Avenue, 14th Floor, Miami, Florida, 33131 (305) 789-9200

### DEFENDANTS

CBS Interactive, Inc.

County of Residence of First Listed Defendant   New York County, NY
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT LAND INVOLVED.

Attorneys (If Known)

**(d)** Check County Where Action Arose: ☑ MIAMI- DADE  ❏ MONROE  ❏ BROWARD  ❏ PALM BEACH  ❏ MARTIN  ❏ ST. LUCIE  ❏ INDIAN RIVER  ❏ OKEECHOBEE HIGHLANDS

### II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

❏ 1 U.S. Government Plaintiff
❏ 2 U.S. Government Defendant
❏ 3 Federal Question (U.S. Government Not a Party)
☑ 4 Diversity (Indicate Citizenship of Parties in Item III)

### III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ❏ 1 | ❏ 1 | Incorporated or Principal Place of Business In This State | ❏ 4 | ❏ 4 |
| Citizen of Another State | ❏ 2 | ❏ 2 | Incorporated and Principal Place of Business In Another State | ❏ 5 | ☑ 5 |
| Citizen or Subject of a Foreign Country | ❏ 3 | ❏ 3 | Foreign Nation | ❏ 6 | ❏ 6 |

*Dade 08cv22504-Moore-Simonton*

### IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ❏ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ❏ 610 Agriculture | ❏ 422 Appeal 28 USC 158 | ❏ 400 State Reapportionment |
| ❏ 120 Marine | ❏ 310 Airplane | ❏ 362 Personal Injury - Med. Malpractice | ❏ 620 Other Food & Drug | ❏ 423 Withdrawal 28 USC 157 | ❏ 410 Antitrust |
| ❏ 130 Miller Act | ❏ 315 Airplane Product Liability | ❏ 365 Personal Injury - Product Liability | ❏ 625 Drug Related Seizure of Property 21 USC 881 | | ❏ 430 Banks and Banking |
| ❏ 140 Negotiable Instrument | ❏ 320 Assault, Libel & Slander | ❏ 368 Asbestos Personal Injury Product Liability | ❏ 630 Liquor Laws | **PROPERTY RIGHTS** | ❏ 450 Commerce |
| ❏ 150 Recovery of Overpayment & Enforcement of Judgment | ❏ 330 Federal Employers' Liability | | ❏ 640 R.R. & Truck | ❏ 820 Copyrights | ❏ 460 Deportation |
| ❏ 151 Medicare Act | ❏ 340 Marine | **PERSONAL PROPERTY** | ❏ 650 Airline Regs. | ❏ 830 Patent | ❏ 470 Racketeer Influenced and Corrupt Organizations |
| ❏ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ❏ 345 Marine Product Liability | ❏ 370 Other Fraud | ❏ 660 Occupational Safety/Health | ❏ 840 Trademark | ❏ 480 Consumer Credit |
| ❏ 153 Recovery of Overpayment of Veteran's Benefits | ❏ 350 Motor Vehicle | ❏ 371 Truth in Lending | ❏ 690 Other | **SOCIAL SECURITY** | ❏ 490 Cable/Sat TV |
| ❏ 160 Stockholders' Suits | ❏ 355 Motor Vehicle Product Liability | ❏ 380 Other Personal Property Damage | **LABOR** | ❏ 861 HIA (1395ff) | ❏ 810 Selective Service |
| ❏ 190 Other Contract | ❏ 360 Other Personal Injury | ❏ 385 Property Damage Product Liability | ❏ 710 Fair Labor Standards Act | ❏ 862 Black Lung (923) | ❏ 850 Securities/Commodities/Exchange |
| ❏ 195 Contract Product Liability | | | ❏ 720 Labor/Mgmt. Relations | ❏ 863 DIWC/DIWW (405(g)) | ❏ 875 Customer Challenge 12 USC 3410 |
| ❏ 196 Franchise | | | ❏ 730 Labor/Mgmt.Reporting & Disclosure Act | ❏ 864 SSID Title XVI | ❏ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ❏ 740 Railway Labor Act | ❏ 865 RSI (405(g)) | ❏ 891 Agricultural Acts |
| ❏ 210 Land Condemnation | ❏ 441 Voting | ❏ 510 Motions to Vacate Sentence | ❏ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ❏ 892 Economic Stabilization Act |
| ❏ 220 Foreclosure | ❏ 442 Employment | **Habeas Corpus:** | ❏ 791 Empl. Ret. Inc. Security Act | ❏ 870 Taxes (U.S. Plaintiff or Defendant) | ❏ 893 Environmental Matters |
| ❏ 230 Rent Lease & Ejectment | ❏ 443 Housing/ Accommodations | ❏ 530 General | | ❏ 871 IRS Third Party 26 USC 7609 | ❏ 894 Energy Allocation Act |
| ❏ 240 Torts to Land | ❏ 444 Welfare | ❏ 535 Death Penalty | **IMMIGRATION** | | ❏ 895 Freedom of Information Act |
| ❏ 245 Tort Product Liability | ❏ 445 Amer. w/Disabilities - Employment | ❏ 540 Mandamus & Other | ❏ 462 Naturalization Application | | ❏ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ❏ 290 All Other Real Property | ❏ 446 Amer. w/Disabilities - Other | ❏ 550 Civil Rights | ❏ 463 Habeas Corpus-Alien Detainee | | |
| | ❏ 440 Other Civil Rights | ❏ 555 Prison Condition | ❏ 465 Other Immigration Actions | | ❏ 950 Constitutionality of State Statutes |

### V. ORIGIN (Place an "X" in One Box Only)

☑ 1 Original Proceeding
❏ 2 Removed from State Court
❏ 3 Re-filed- (see VI below)
❏ 4 Reinstated or Reopened
❏ 5 Transferred from another district (specify)
❏ 6 Multidistrict Litigation
❏ 7 Appeal to District Judge from Magistrate Judgment

### VI. RELATED/RE-FILED CASE(S).
(See instructions second page):

a) Re-filed Case ❏ YES ☑ NO   b) Related Cases ☑ YES ❏ NO

JUDGE                  DOCKET NUMBER  2008-CV-05097-ADM-SRN

### VII. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (Do not cite jurisdictional statutes unless diversity):

28 U.S.C. § 1332

LENGTH OF TRIAL via  5  days estimated (for both sides to try entire case)

### VIII. REQUESTED IN COMPLAINT:

❏ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $ in excess of $75,000
CHECK YES only if demanded in complaint:
JURY DEMAND: ☑ Yes ❏ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE OF ATTORNEY OF RECORD

s/
CHRISTOPHER E. KNIGHT

DATE
September 9, 2008

FOR OFFICE USE ONLY
AMOUNT  $350.00  RECEIPT #  98682 6

09/09/08